REVISED, JULY 13, 2000

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 00-30134

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES HARVEY BROWN, also known as Jim Brown,

Defendant-Appellant.

Appeal from the United States District Court for the
Middle District of Louisiana, Baton Rouge

July 6, 2000

Before KING, Chief Judge, and GARWOOD and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant James Harvey "Jim" Brown (Brown), a prominent Louisiana political figure, is currently under indictment in the Middle District of Louisiana on various charges relating to the brokering of an alleged "sham" settlement of a threatened lawsuit by the State of Louisiana against the president of a failed automobile insurance company. The district court *sua sponte* entered a gag order that prohibits attorneys, parties, or witnesses from discussing with "any public communications media" anything

about the case "which could interfere with a fair trial," including statements "intended to influence public opinion regarding the merits of this case," with exceptions for matters of public record and matters such as assertions of innocence. The district court denied Brown's motion to vacate or modify the gag order, and Brown now appeals that denial. We affirm.

## Facts and Proceedings Below

Brown is the elected Insurance Commissioner for the State of Louisiana. On September 24, 1999, Brown, along with five others, including former Louisiana Governor Edwin W. Edwards (Edwards), was indicted in United States District Court for the Middle District of Louisiana on numerous counts of conspiracy, mail and wire fraud, insurance fraud, making false statements, and witness tampering. The charges all relate to Brown's alleged use of his influence as Insurance Commissioner to help construct, along with Edwards and the other defendants, a "sham settlement" that derailed a $27 million lawsuit threatened by the state against David Disiere, president of Cascade Insurance Co., a failed automobile insurance carrier. In a news conference shortly after the indictment was issued, Brown declared his innocence as well as his belief that he was the victim of a "political drive-by shooting" at the hands of "an out-of-control prosecutor." After some delays, the trial is currently scheduled to commence on August 21, 2000.

On the day the indictment was issued against Brown and his co-

2

defendants, the district court entered on its own motion a gag order prohibiting parties, lawyers, and potential witnesses from giving to "any public communications media" "any extrajudicial statement or interview" about the trial (other than matters of public record) that "could interfere with a fair trial or prejudice any defendant, the government, or the administration of justice." The order provides that "[s]tatements or information intended to influence public opinion regarding the merits of this case are specifically designated as information which could prejudice a party." The order expressly does not prevent the parties from discussing, "without elaboration or any kind of characterization," (1) the general nature of any allegations or defenses; (2) information contained in the public record; (3) scheduling information; (4) any decision or order by the court that is a matter of public record; and (5) "the contents or substance" of any motion filed in the case, to the extent the motion is a matter of public record.

The district court had previously entered a similar gag order for a related case pending in the same court in which Edwards was also a defendant. In that case, Edwards and six others were charged with multiple counts of racketeering, extortion, money laundering, and wire and mail fraud for allegedly extorting money from parties who sought licenses to operate riverboat casinos in Louisiana. On May 9, 2000, the jury convicted Edwards and four

3

other defendants; the district court has subsequently lifted the gag order in that case. A third case is also pending before the same district court, this one concerning allegations that three individuals (not parties to the present appeal) improperly used their political influence to steer the awarding of certain lucrative contracts. As the district court noted, these three cases concern different alleged acts of wrongdoing but involve many of the same defendants and arose from the same federal investigation. Given the allegations of corruption against several prominent political and business figures, all three cases have generated extensive and intense local and national media attention.

On September 28, 1999, the district court temporarily lifted the gag order in this case to avoid interfering with Brown's re-election campaign for Insurance Commissioner. Shortly thereafter, various defendants[1] released to the media recordings (as well as transcripts of recordings) of telephone conversations relevant to the case, and also conducted interviews while playing the recordings. The release of these recordings attracted further interest from the press. On October 7, 1999, the district court entered a limited order prohibiting the parties from releasing recordings (or transcripts of recordings) made prior to the trial. The limited order also prohibited the release of any other

---

[1]In its denial of Brown's motion to vacate or modify the order, the district court noted that this had happened but did not specify which defendants engaged in these acts.

4

discoverable material.  At a status conference on October 14, 1999, the district court explained that it had entered the limited order "to stop an avalanche of both government and defendants picking out tapes and start playing all these tapes on radio and television." The court also invited the parties to suggest modifications to the order if they believed any modifications were necessary.  None did so.

On November 18, 1999, the district court reimposed the original gag order, to be effective in its entirety when the polls closed on November 20, voting day for the Insurance Commissioner run-off election.[2]  At a status conference conducted on November 18, Brown objected to the gag order.  The district court responded that it believed the order to be necessary in light of the considerable publicity surrounding the trial,[3] but emphasized his willingness to consider any modification that the parties might suggest.[4]  On November 30, 1999, Brown moved to vacate or modify the order.  After conducting a hearing on the motion on January 4, 2000, the district court requested that the parties submit proposed modifications to the gag order.  Brown proposed that the substance of the order remain intact, but that it should only apply to

---

[2]Brown was ultimately re-elected Insurance Commissioner.

[3]Regarding the intense media interest in the case, including legions of reporters waiting outside the courtroom while the November 18 hearing took place, the district court emphasized that "I am not going to let this get out of hand."

[4]"I modified it once; I can modify it again."

5

counsel, not to defendants or witnesses. On February 4, 2000, the district court denied Brown's motion to vacate or modify the gag order. Brown then petitioned this Court for a writ of mandamus to vacate the gag order; his petition was denied. *See In re Brown*, No. 00-30144 (5th Cir. Feb. 21, 2000) (unpublished). On February 7, 2000, Brown filed a notice of appeal from the district court's denial of his motion to vacate or modify the gag order. It is that appeal which we address here.

**Discussion**

I. Jurisdiction

As a threshold matter, we must determine whether we have jurisdiction to hear Brown's appeal at all. Both Brown and the only other party to this appeal, appellee the United States, which defends the district court's order, agree that the order is appealable. However, "appellate jurisdiction is not a matter of consent." *Trient Partners I Ltd. v. Blockbuster Entertainment Corp.*, 83 F.3d 704, 708 (5th Cir. 1996). This question is particularly important in light of a recent decision by another panel of this Court, which casts some doubt on our ability to hear the appeal. In the riverboat casino license case, which had been pending before the same district court, Edwards and the other defendants appealed the district court's denial of their motion to lift an identical gag order. This Court dismissed their appeal for lack of jurisdiction. *See United States v. Edwards*, 206 F.3d 461

6

(5th Cir. 2000) (*per curiam*).  The special circumstances in *Edwards*, however, distinguish it, and we conclude that we have jurisdiction to consider the merits of Brown's appeal.

In what is commonly referred to as the final judgment rule, Congress has limited the jurisdiction of this Court to "final decisions of the district courts."  28 U.S.C. § 1291.  One of the exceptions to the final judgment rule is known as the collateral order doctrine, which the Supreme Court announced in *Cohen v. Beneficial Industrial Loan Corp.*, 69 S.Ct. 1221 (1949).  "The collateral order doctrine establishes that certain decisions of the district court are final in effect although they do not dispose of the litigation."  *Davis v. East Baton Rouge Parish Sch. Bd.*, 78 F.3d 920, 925 (5th Cir. 1996).  Under this doctrine, some orders may be appealed despite the absence of final judgment if they (1) are conclusive, (2) resolve important questions that are separate from the merits, and (3) are effectively unreviewable on appeal from the final judgment in the underlying action.  *See In re Grand Jury Subpoena*, 190 F.3d 375, 381 (5th Cir. 1999) (quoting *Cunningham v. Hamilton County*, 119 S.Ct. 1915, 1919 (1999)).

We conclude that the district court's denial of Brown's motion to vacate or modify the gag order is appealable under the collateral order doctrine.  First, in terms of Brown's request that the gag order be vacated entirely or at least not applied to him, the order is conclusive.  Second, the question at issue-weighing

7

the competing interests of a trial participant's First Amendment right to discuss his criminal trial freely against the district court's obligation to ensure a fair trial and dispense justice in an orderly manner–is unquestionably important. Moreover, it is entirely divorced from the merits of Brown's criminal trial. Third, the district court's refusal to vacate or modify the gag order as Brown requested would be completely unreviewable not only in the event of Brown's acquittal, but also doubtless in the event of conviction because Brown would almost certainly be unable to demonstrate that his conviction had somehow been tainted by his inability to make "extrajudicial comments," to the public media, which, by definition, have no bearing on the trial itself. Brown asserts First Amendment, not fair trial, rights.

We do not believe that the holding of the *Edwards* panel requires us to reach a different conclusion. The *Edwards* panel omitted any explanation why the gag order in that case was not appealable under the collateral order doctrine, *i.e.*, it did not state which, if any, of the doctrine's three factors the order failed to satisfy. The *Edwards* panel did, however, specifically mention a feature of the *Edwards* appeal distinguishing it from Brown's, namely that the *Edwards* defendants waited ten months before either objecting to the gag order or attempting to have it modified. The district court dismissed their motion to vacate or modify as "frivolous." *Edwards*, 206 F.3d at 462. In this case, by

8

contrast, Brown objected immediately to the gag order and has pursued his objection vigorously. Unlike the *Edwards* defendants, he has not been dilatory. Nor do we discern anything frivolous about Brown's appeal. Another aspect of Brown's appeal distinguishes it from *Edwards*. Brown's argument on appeal, as below, is that the order violates his First Amendment rights; he does not argue that it damages his right to a fair trial. However, the *Edwards* opinion reflects that the argument of the putative appellants there was that the gag order "[wa]s damaging the [D]efendants ability to obtain a fair trial." *Id*. at 462. Whether the gag order did materially damage the *Edwards* defendants' fair trial rights would have to be determined on appeal from any conviction and *if* such contention were sustained,[5] would be wholly vindicated by ordering a new trial, while an acquittal would necessarily negate any injury to the fair trial interest. As above noted, however, that is simply not the case with respect to Brown's First Amendment claim. We conclude that *Edwards* is not controlling in the present setting.

The *Edwards* panel's wariness of applying the collateral order doctrine was also apparently influenced by the Supreme Court's command that federal courts apply the collateral doctrine "with the

---

[5]And basing the motion to vacate the gag order on such an argument may have been, in addition to motion's belatedness, what prompted the *Edwards* trial court to characterize the motion to vacate as "frivolous."

utmost strictness" in criminal cases. *See Flanagan v. United States*, 104 S.Ct. 1051, 1054 (1984). Animating this reticence to apply the collateral order exception in criminal cases is section 1291's policy of finality, which is most compelling in the criminal context. *See id.; see also United States v. Hollywood Motor Car Co.*, 102 S.Ct. 3081 (1982) (*per curiam*) ("This Court has long held that [the doctrine of finality] is inimical to piecemeal appellate review of trial court decisions which do not terminate the litigation, and that this policy is at its strongest in the field of criminal law . . . ."); *DiBella v. United States*, 82 S.Ct. 654, 656-57 (1962) ("Th[e] insistence on finality and prohibition of piecemeal review discourage undue litigiousness and leaden-footed administration of justice, particularly damaging to the conduct of criminal cases."). Each type of pretrial order that the Supreme Court has recognized as appropriate for interlocutory appeal via the collateral order doctrine–orders denying a motion to reduce bail, or denying a motion to dismiss an indictment on Double Jeopardy, Speech, or Debate Clause grounds– not only satisfied the requirements of *Cohen*, but also involved "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *Flanagan*, 104 S.Ct. at 1055 (citation omitted). Brown's asserted right to contemporaneously comment on his case in public and defend his reputation would, like the other rights recognized by the Supreme Court, "be irretrievably

10

lost if review were postponed until trial is completed." *Id.*
Moreover, Brown's interest in contemporaneously making his case
before the public would arguably not be "largely satisfied by an
acquittal resulting from the prosecution's failure to carry its
burden of proof," *id.* at 1056, and the damage to his personal and
professional reputations may already be done by the conclusion of
trial.

Importantly, hearing Brown's appeal under the collateral
order doctrine does nothing to threaten or undermine the finality
of, or the conduct of proceedings in, his criminal case because the
trial will proceed regardless of this Court's consideration of his
present appeal and the result of this appeal, favorable to Brown or
not, will not be dispositive of the merits of or procedures
followed in his criminal case. Because such finality concerns were
the Supreme Court's principal reason for eschewing the collateral
order doctrine in all but a few types of orders in criminal cases,
we see no reason *not* to entertain this appeal pursuant to the
doctrine.

Our conclusion finds support in the fact that this Court and
other Courts of Appeals have repeatedly held, in both civil and
criminal trials, that gag orders imposed on members of the press
are appealable under the collateral order doctrine. *See Davis*, 78
F.3d at 925-26 (holding that district court's denial of news
agencies' motion to vacate confidentiality order in desegregation

11

litigation appealable under collateral order doctrine); *United States v. Chagra*, 701 F.2d 354, 358 (5th Cir. 1983) (finding that district court's closure of pretrial bail reduction hearing was appealable under the doctrine); *United States v. Gurney*, 558 F.2d 1202, 1207 (5th Cir. 1977) (concluding that denial of press access to certain court documents in high-profile criminal suit was an appealable collateral order); *see also In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1330 (D.C. Cir. 1985); *United States v. Schiavo*, 504 F.2d 1, 4 (3d Cir. 1974). This Court's decisions allowing appeals by the press of gag orders did not depend on any special status of the press as third-parties to the criminal trial. *See Davis*, 78 F.3d at 925-26; *Chagra*, 701 F.2d at 358; *Gurney*, 558 F.2d at 1202. Accordingly, we perceive no reason to limit the appealability of this type of order to members of the media alone.

In that same vein, we note that other Courts of Appeals have also found gag orders appealable under the collateral order doctrine by trial participants, including the litigants themselves. *See*, *e.g.*, *In re Rafferty*, 864 F.2d 151, 155 (D.C. Cir. 1988) (finding in a civil case that "[i]t would certainly be anomalous if a litigant in Mr. Rafferty's shoes who wished to distribute information to the government or to the media could not appeal an order forbidding him from doing so, while the newspaper to whom he wished to give his story were able to appeal"); *United States v.*

12

*Ford*, 830 F.2d 596, 598 (6th Cir. 1987) (finding jurisdiction under collateral order doctrine to consider appeal by criminal defendant politician contesting validity of gag order). Regarding this jurisdictional question, *Ford* is on point with both *Edwards* and the present appeal. While the *Edwards* panel chose not to follow *Ford* "in the circumstances of this case," *see Edwards*, 206 F.3d at 462 n.1, we see no reason not to do so in the present somewhat difference circumstances.[6] We hold, therefore, that pursuant to the collateral order doctrine, we have jurisdiction over Brown's appeal from the district court's order.[7]

---

[6]As discussed in Part II, *infra*, we do not find *Ford* controlling in our disposition of Brown's constitutional claim under the facts here.

[7]We reject Brown's alternative argument that this Court has jurisdiction under 28 U.S.C. § 1292(a)(1). Section 1292(a)(1) authorizes appeals from interlocutory orders that grant or deny an injunction, or have "the practical effect of doing so." *United States v. Garner*, 749 F.2d 281, 286 (5th Cir. 1985) (quoting *Carson v. American Brands, Inc.*, 101 S.Ct. 993, 996-97 (1981)). Whether or not the gag order has the practical effect of granting an injunction against making extrajudicial comments, "[a]n order by a federal court that relates only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 108 S.Ct. 1133, 1138 (1988); *see also Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc.*, 87 S.Ct. 193, 195 (1966) ("Orders that in no way touch on the merits of the claim but only relate to pretrial procedures are not in our view ‹interlocutory' within the meaning of [§] 1292(a)(1)."); *Rauscher Pierce Refsnes, Inc. v. Birenbaum*, 860 F.2d 169, 172 (5th Cir. 1988); *Shanks v. City of Dallas*, 752 F.2d 1092, 1095 (5th Cir. 1985). Accordingly, section 1292(a)(1) "does not authorize appeals from orders that compel or restrain conduct pursuant to the court's authority to control proceedings before it, even if the order is cast in injunctive terms." *Hamilton v. Robertson*, 854 F.2d 740, 741 (5th Cir. 1988) (*per*

13

II.  Brown's Constitutional Claim

Brown contends that the district court's gag order violates his rights under the First Amendment.  We do not agree.  While this case presents a somewhat close call, we conclude that the gag order is constitutionally permissible because it is based on a reasonably found substantial likelihood that comments from the lawyers and parties might well taint the jury pool, either in the present case or one of the two related cases, is the least restrictive corrective measure available to ensure a fair trial, and is sufficiently narrowly drawn.  The district court applied the correct legal principles in entering such an order and its factual conclusions are adequately supported by the record.

Intense publicity surrounding a criminal proceeding–what Justice Frankfurter referred to as "trial by newspaper"–poses significant and well-known dangers to a fair trial. *See Pennekamp v. Florida*, 66 S.Ct. 1029, 1043, 1047 (1946) (Frankfurter, J., concurring) ("[I]t is indispensable . . . that in a particular controversy pending before a court and awaiting judgment, human beings, however strong, should not be torn from their moorings of impartiality by the undertow of extraneous influence."); *see also Bridges v. California*, 62 S.Ct. 190, 197 (1941) ("Legal trials are

---

*curiam*) (quoting *Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1066 (5th Cir. 1986)).  As a case management order, the gag order at issue here was indisputably crafted to control the proceedings, in no way impacts the merits of the case against Brown, and therefore is not appealable under section 1292(a)(1).

not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper."); *Patterson v. Colorado*, 27 S.Ct. 556, 558 (1907) (Holmes, J.) ("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."). Paramount among these dangers is the potential that pretrial publicity may taint the jury venire, resulting in a jury that is biased toward one party or another.[8] "Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by ‹impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Gentile v. State Bar of Nevada*, 111 S.Ct. 2720, 2745 (1991).

Accordingly, trial courts have "an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity." *Gannett Co. v. DePasquale*, 99 S.Ct. 2898, 2904 (1979); *see also Chandler v. Florida*, 101 S.Ct. 802, 809 (1981) ("Trial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law."); *United States v. Noriega*, 917 F.2d 1543, 1549 (11th Cir.) (*per curiam*), *cert. denied sub nom. Cable News Network*

---

[8]Other principal dangers include disseminating to the press inadmissible evidence, the exclusion of which at trial "is rendered meaningless when news media make it available to the public," as well as creating a "carnival atmosphere," which threatens the integrity of the proceeding. *See Sheppard v. Maxwell*, 86 S.Ct. 1507, 1520-21 (1966).

*v. Noriega*, 111 S.Ct. 451 (1990).  The beneficiaries of this duty include not only the defendant in a given trial, but other defendants as well, such as co-defendants in the same case or defendants in related cases (as there are here), whose fair trial rights might be prejudiced by the extrajudicial statements of other trial participants.  The vigilance of trial courts against the prejudicial effects of pretrial publicity also protects the interest of the public and the state in the fair administration of criminal justice.[9]

_____

[9]It makes no difference that Brown is contesting the gag order as violative of his First Amendment rights instead of embracing it as protective of his Sixth Amendment right to a fair trial.  As one commentator has aptly noted, "under the Sixth Amendment, a criminal defendant is entitled to a fair and impartial jury, not a jury whose views have been deliberately manipulated by outside influences to be biased in his or her favor."  Eileen A. Minnefor, *Looking for Fair Trials in the Information Age: The Need for More Stringent Gag Orders Against Trial Participants*, 20 U.S.F. L. REV. 95, 115-16 (1995) (citing *Pennekamp*, 66 S.Ct. at 1044 (Frankfurter, J., concurring)); *see also In re Morrissey*, 168 F.3d 134, 138 (4th Cir. 1999) (noting that local rules of professional conduct limiting lawyers' extrajudicial comments further "the important governmental interest of protecting both the accused's and the public's right to a fair trial"); *Levine v. United States Dist. Court*, 764 F.2d 590, 596-97 (9th Cir. 1985) ("It does not follow . . . that the need to restrict publicity is lessened when the publicity is caused by the actions of the defense, rather than the prosecution."); *United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir. 1969); *cf. Estes v. Texas*, 85 S.Ct. 1628, 1636 (1965) ("A defendant on trial for a specific crime is entitled to his day in court, not in a stadium, or a city or nationwide arena."); *Singer v. United States*, 85 S.Ct. 783, 790 (1965) ("The Government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before a tribunal which the Constitution regards as most likely to produce a fair result."). Accordingly, it seems to us that the *Ford* Court was incorrect when it stated, "[t]o the extent that publicity is a disadvantage for the government, the government must tolerate it."  *Ford*, 830 F.2d at 600.

This duty comports with the constitutional status of all First Amendment freedoms, which are not absolute but must instead be "applied in light of the special characteristics of the [relevant] environment." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 89 S.Ct. 733, 736 (1969). Indeed, "[a]lthough litigants do not 'surrender their First Amendment rights at the courthouse door,' those rights may be subordinated to other interests that arise" in the context of both civil and criminal trials. *Seattle Times Co. v. Rhinehart*, 104 S.Ct. 2199, 2207-08 n.18 (1984). "[O]n several occasions this Court has approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant." *Id.* There can be no question that a criminal defendant's right to a fair trial may not be compromised by commentary, from any lawyer or party, offered up for media consumption on the courthouse steps. *See Estes v. Texas*, 85 S.Ct. 1628, 1632 (1965) ("We have always held that the atmosphere essential to the preservation of a fair trial-the most fundamental of all freedoms-must be maintained at all costs."); *Pennekamp*, 66 S.Ct. at 1047 (Frankfurter, J., concurring) ("In securing freedom of speech, the Constitution hardly meant to create the right to influence judges or juries.").

Despite the fact that litigants' First Amendment freedoms may by limited in order to ensure a fair trial, gag orders such as this one still exhibit the characteristics of prior restraints. *See In*

17

*re Dow Jones*, 842 F.2d 603, 609 (2d Cir. 1988); *Levine v. United States District Court*, 764 F.2d 590, 595 (9th Cir. 1985). Prior restraints–"predetermined judicial prohibition restraining specified expression"–face a well-established presumption against their constitutionality. *See Bernard v. Gulf Oil Co.*, 619 F.2d 459, 467 (5th Cir. 1980) (*en banc*) (citations omitted). In general, a prior restraint (usually directed at the press) will be upheld only if the government can establish that "the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest." *See Levine*, 764 F.2d at 595 (citations omitted). The government must also establish that the order has been narrowly drawn and is the least restrictive means available. *See id.* (citations omitted).

A. Appropriate Legal Standard

The first element of the prior restraint analysis–the showing of harm necessary to justify the need for the restraint–requires some discussion in the present context because the gag order at issue here is directed at trial participants and not the press. The Supreme Court and other Courts of Appeals have recognized a "distinction between participants in the litigation and strangers to it," pursuant to which gag orders on trial participants are evaluated under a less stringent standard than gag orders on the press. *See Gentile*, 111 S.Ct. at 2743-44; *News-Journal Corp. v. Foxman*, 939 F.2d 1499, 1512-13 & n.16 (11th Cir. 1991); *Dow Jones*,

18

842 F.2d at 608-09; *Levine*, 764 F.2d at 595. The genesis of this distinction lies in part in *Sheppard v. Maxwell*, 86 S.Ct. 1507 (1966), which concerned the massive publicity surrounding the trial of Dr. Sam Sheppard. The Supreme Court observed that during Sheppard's trial, "bedlam," in the form of reporters virtually taking over the courtroom and accosting witnesses as they left the building, "reigned at the courthouse." *See id.* at 1518. The Court also noted that inadmissible (and often inaccurate) information had been leaked to the public, fueling the firestorm of publicity already raging around the case. *See id.* at 1521. Acknowledging the importance of a free and responsible press as "the handmaiden of effective judicial administration, especially in the criminal field," *id.* at 1515, the Court considered various, less restrictive alternatives to gagging the press itself; among them, the Court stated that "the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters," *id.* at 1521.[10] In that case, a gag order imposed on the trial participants "might well have prevented the divulgence of inaccurate information, rumors, and accusations that made up much of the inflammatory publicity, at least after Sheppard's indictment," *id.* at 1521,

---

[10]The other corrective measures discussed in *Sheppard* included change of venue, trial postponement, a "searching" voir dire, jury instructions, and juror sequestration. *See Nebraska Press Ass'n v. Stuart*, 96 S.Ct. 2791, 2804-05 (1976); *Sheppard*, 86 S.Ct. at 1519-22.

19

"without [a] corresponding curtailment of the news media," *id.* at 1522.[11] The Court noted that due process "requires that the accused receive a trial by an impartial jury free from outside influences" and that "[n]either prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers . . . should be permitted to frustrate its function." *Id.*

Ten years later, in *Nebraska Press Association v. Stuart*, 96 S.Ct. 2791 (1976), the Supreme Court vacated on prior restraint grounds an order prohibiting the press from publishing accounts about certain evidence that would be used in a widely reported murder trial taking place in a small, rural community. *See* 96 S.Ct. at 2807. In doing so, the Court endorsed *Sheppard*'s proposal that trial courts employ methods short of prior restraints on the press, including the prohibition of extrajudicial comments by trial participants, in order to mitigate the potentially prejudicial effects of pretrial publicity. *See id.* at 2800-01; *see also Foxman*, 939 F.2d at 1514 (11th Cir. 1991).[12]

---

[11]The *Sheppard* Court further noted that "[h]ad the judge, the other officers of the court, and the police placed the interest of justice first, the news media would have soon learned to be content with the task of reporting the case as it unfolded in the courtroom—not pieced together from extrajudicial statements." *Id.* at 1522.

[12]In a situation more analogous to the present case, then-Associate Justice Rehnquist, writing as Circuit Justice, denied the request by a media organization and group of reporters to stay a judicially imposed gag order restraining trial participants from speaking directly with the press about a high-profile murder trial. *See KPNX Broad.Co. v. Arizona Superior Court*, 103 S.Ct. 584 (Rehnquist, Circuit Justice 1982). Citing *Sheppard*'s admonition

*Gentile v. State Bar of Nevada*, 111 S.Ct. 2720 (1991), represents the Supreme Court's most recent discussion of limitations imposed on the speech of trial participants. In *Gentile*, the Court considered an attack on a Nevada Supreme Court rule prohibiting any attorney from making extrajudicial comments to the media that the attorney knew or should have known would "have a substantial likelihood of materially prejudicing an adjudicative proceeding." *Gentile*, 111 S.Ct. at 2723.[13] Observing that in earlier opinions the Court had "expressly contemplated that the speech of those participating before the courts could be limited," a majority of the *Gentile* Court stated that prior precedent, including *Sheppard*, "rather plainly indicate[d] that the speech of lawyers representing clients in pending cases may be regulated under a *less demanding standard* than that established for

---

that trial courts take measures to avoid the prejudicial effects of publicity in sensational cases, Justice Rehnquist concluded that "I do not have the slightest doubt that a trial judge may insist that the only performance which goes on in the courtroom is the trial of the case at hand." *Id.* at 586. He further observed that "[t]he mere potential for confusion if unregulated communication between trial participants and the press at a heavily covered trial were permitted is enough to warrant a measure such as the trial judge took in this case." *Id.* at 586-87.

[13]In *Gentile*, an attorney representing a criminal defendant called a press conference and, in violation of the Nevada rule, lambasted the investigating officers and other victims as corrupt. 111 S.Ct. at 2739. Much like Brown, the attorney admitted that his motivation for doing so was "to counter public opinion which he perceived as adverse to his client, to fight back against the perceived efforts of the prosecution to poison the prospective juror pool, and to publicly present his client's side of the case." *Id.*

21

regulation of the press in *Nebraska Press*." *Id.* at 2744 (opinion of Rehnquist, C.J.) (citations omitted) (emphasis added). Accordingly, the Court found that demonstrating a "substantial likelihood of material prejudice" from an attorney's extrajudicial comments, which the Nevada rule required, as opposed to a "clear and present danger," was constitutionally sufficient to justify prescribing attorney comments of that type. *See id.* at 2745; *cf. In re Express-News Corp.*, 695 F.2d 807, 810 (5th Cir. 1982) (applying strict scrutiny to court order denying *press* right to interview jurors).

In *Gentile*, the Supreme Court merely approved Nevada's "substantial likelihood" standard when applied to gag orders imposed on attorneys, but did not mandate it as a constitutional minimum necessary to justify a judicially-imposed restriction on attorney speech. Moreover, neither the Supreme Court nor this Court has articulated a standard to apply when evaluating gag orders directed at attorney or non-attorney trial participants.[14]

---

[14]*Davis v. East Baton Rouge Parish School Board*, 78 F.3d 920 (5th Cir. 1996), which concerned an appeal by the press of a court-imposed confidentiality order on parties and attorneys in a school desegregation case, is of limited relevance to this appeal. As the district court noted, *Davis* was a non-jury civil case in which the Court found "no possibility that publicity will prejudice potential jurors." *Id.* at 929. Moreover, *Davis* did not announce any standard by which to judge this order; the Court declined to decide whether to apply strict scrutiny "or some variant of the reasonable likelihood standard" because the order could not survive under either. *See id.* This case, by contrast, is a criminal matter in which the primary concern of the district court was the possibility that pretrial publicity would taint the jury pools for Brown's trial and the two related trials.

Our sister circuits have not reached a consensus on this question. The Fourth and Tenth Circuits have held that a trial court may restrict extrajudicial comments by trial participants, including lawyers, parties, and witnesses, based on a determination that those comments present a "reasonable likelihood" of prejudicing a fair trial. *See In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984); *United States v. Tijerina*, 412 F.2d 661, 666-67 (10th Cir. 1969).[15] The Sixth, Seventh, and Ninth Circuits have applied more stringent tests, requiring either a showing of "clear and present danger" or "serious and imminent threat" of prejudicing a fair trial. *See Ford*, 830 F.2d at 600-02 ("clear and present danger"); *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 249 (7th Cir. 1975), *cert. denied sub nom. Cunningham v. Chicago Council of Lawyers*, 96 S.Ct. 3201 (1976) ("serious and imminent threat"); *Levine*, 764 F.2d at 596 ("clear and present danger").

---

[15]In an appeal *by members of the media* challenging a gag order that restrained participants in a criminal trial from speaking with the press, the Second Circuit has also held that a "reasonable likelihood" that pretrial publicity will prejudice a fair trial is sufficient to justify an order of that type. *See Dow Jones*, 842 F.2d at 609. Here, Brown is the sole challenger of the gag order.

Two recent opinions have addressed fact patterns similar to *Gentile* and, in light of that case, have followed local rules of professional conduct that prohibit attorneys from making extrajudicial comments that are "reasonably likely" to prejudice the proceedings. *See Morrissey*, 168 F.3d at 140 (concluding that the "reasonable likelihood" standard was constitutionally permissible under *Gentile*); *United States v. Cutler*, 58 F.3d 825, (2d Cir. 1995) (affirming contempt conviction for criminal defense attorney who violated court order demanding compliance with local rule that used "reasonable likelihood" standard).

23

We decline to adopt the more stringent tests advocated by the Sixth, Seventh, and Ninth Circuits because *Gentile* appears to have foreclosed the applicability of those tests to the regulation of speech by trial participants. The cases endorsing some version of the "clear and present danger" test all predated *Gentile* and did not consider the distinction–explicitly recognized in that case–between trial participants and the press for purposes of a trial court's ability to restrict the speech of those two groups. *See*, *e.g.*, *Ford*, 830 F.2d at 598. Under *Gentile*, *Sheppard*, and *Nebraska Press*, it seems plain that the "clear and present danger" test, and the variants thereof, are appropriate for protecting the unique role of the press as the public's "eyes and ears" into the criminal justice system. *Cf. Houchins v. KQED, Inc.*, 98 S.Ct. 2588, 2593 (1978) (characterizing the press as the "eyes and ears" of the public).

Having rejected the "clear and present danger" test, we must next identify an appropriate, less stringent standard. As noted above, the Fourth and Tenth Circuits have concluded that gag orders imposed on any trial participant may be justified by a "reasonable likelihood" that extrajudicial commentary will prejudice a fair trial. *See Russell*, 726 F.2d at 1010; *Tijerina*, 412 F.2d at 666-67. The Supreme Court in *Gentile* found that a "substantial likelihood" of prejudice was sufficient to justify a restriction on extrajudicial comments by attorneys. The difference between these

24

two standards is not clear-we would assume that "substantial likelihood" connotes a stronger showing than "reasonable likelihood"-but we do not decide between them here. Instead, we conclude that a district court may in any event impose an appropriate gag order on parties and/or their lawyers if it determines that extrajudicial commentary by those individuals would present a "substantial likelihood" of prejudicing the court's ability to conduct a fair trial. We do not address whether a trial court may also impose a similar gag order based on a "reasonable likelihood" of prejudice.

The fact that the gag order in this case concerns the speech of parties as well as attorneys requires some consideration. The *Gentile* Court premised its approval of the Nevada rule's "substantial likelihood" standard in part on the unique role of attorneys as "officers of the court" who "in pending cases [are] subject to ethical restrictions on speech to which an ordinary citizen would not be." *See Gentile*, 111 S.Ct. at 2743. The context of this case is different, however: it concerns a judicially crafted restriction on the extrajudicial speech of all trial participants, not a general rule of professional conduct. An attorney's ethical obligations to refrain from making prejudicial comments about a pending trial will exist whether a gag order is in place or not. In this case, the driving interest of the district court was to preserve the fair trial interests of the parties in

25

all three related cases.  As the district court pointed out, trial participants, like attorneys, "are privy to a wealth of information that, if disclosed to the public, could readily jeopardize the fair trial rights of all parties."  The mischief that might have been visited upon the three related trials–primarily, jury tainting–would have been the same whether prejudicial comments had been uttered by the parties or their lawyers.  In other words, the problem the district court sought to avoid depended in no way on the identity of the speaker as either a lawyer or a party: the interests of the lawyers and the parties in "trying the case in the media" were (and continue to be) the same.  In light of these considerations, there appears to be no reason, at least where lawyers and parties have each demonstrated a "substantial likelihood" of making prejudicial comments outside the courtroom, to distinguish between the two groups for the purpose of evaluating a gag order directed at them both.[16]

In sum, we conclude that in light of *Gentile*, "clear and present danger" cannot be the appropriate standard by which we evaluate gag orders imposed on trial participants.  Instead, the standard must require a lesser showing of potential prejudice.  If the district court determines that there is a "substantial likelihood" (or perhaps even merely a "reasonable likelihood," a

---

[16]There may conceivably be occasions in which we evaluate restrictions placed on speech by attorneys under a different standard than speech by parties, but we do not address that question here.

26

matter we do not reach) that extrajudicial commentary by trial participants will undermine a fair trial, then it may impose a gag order on the participants, as long as the order is also narrowly tailored and the least restrictive means available. This standard applies to both lawyers and parties, at least where the court's overriding interest is in preserving a fair trial and the potential prejudice caused by extrajudicial commentary does not significantly depend on the status of the speaker as a lawyer or party. Accordingly, we now address the propriety of the gag order imposed in this case.

B. Merits of the Gag Order

1. Substantial Likelihood of Prejudice

We conclude that the district court did identify a "substantial likelihood" that the extrajudicial comments of the trial participants would prejudice its ability to conduct fair trials in all three related cases. While the district court did not decide whether it must demonstrate a "clear and present danger" or "reasonable likelihood" of prejudice, and instead determined that it could meet either standard, we find that it met its burden in this case.

In denying Brown's motion to modify the gag order, the district court articulated two major concerns about the possible impact of extrajudicial statements on the three trials, and made specific findings about the conduct of the parties persuading it

that these fears might well be realized. As indicated above, by the time the district court entered the order, the trio of related cases had attracted intense and extensive media attention. The district court's first concern was that "[u]nrestricted statements by the participants in this trial would only serve to increase the volume of pre-trial publicity." This was of course quite legitimate: *Sheppard* made clear that trial judges have a responsibility to avoid the creation of a "carnival atmosphere" in high-profile cases. *See Sheppard*, 86 S.Ct. at 1520-21. The district court's next, and "primary," concern was that the pretrial publicity, especially in the form of extrajudicial comments by the parties, would taint the unsequestered jury already impaneled in *Edwards*, as well as the pool from which the juries in the other two cases would be drawn. This, too, was an entirely appropriate concern. "Extrajudicial comments on, or discussion of, evidence which might never be admitted at trial and ex parte statements by counsel [or parties] giving their version of the facts obviously threaten to undermine [the] basic tenet" that the outcome of a trial must be decided by impartial jurors. *Gentile*, 111 S.Ct. at 2743.

Driving these concerns was the district court's general observation that "the parties in this case have already demonstrated a desire to manipulate media coverage to gain favorable attention." As noted above, during the period in which

28

the district court vacated the gag order so that Brown could pursue his re-election campaign, some of the defendants released to the press recordings and transcripts of recordings of wiretapped conversations, which had previously been subject to the order, and participated in "extensive interviews" while playing the recordings. During a discussion of the tape episode at the November 18, 1999 status conference, one of the defendants (not Brown) who had released a tape explained his actions by stating that he had merely seized "a window of opportunity." A lawyer for the government then suggested that he would match any attempts by the defendants to gain an upper hand in the media coverage of the case.

Based on all of these developments, the district court found it clear "that both the government and the defendants are prepared to 'try this case in the press' and would attempt to use the media to influence the potential jury pool and create a prejudicial media atmosphere, if permitted." The court emphasized that it "cannot and will not permit this to happen." Having reviewed the pretrial record, we conclude that there is a reasonable basis for the district court's concern. The enormous local and national publicity surrounding the cases, the presence of three related trials, which created a heightened and somewhat unique danger of tainting any one of the three juries, as well as the parties' self-proclaimed willingness to seize any opportunity to use the press to

their full advantage, justified the district court's conclusion that there was at least a "substantial likelihood" that allowing further extrajudicial statements by the parties would materially prejudice the court's ability to conduct a fair trial.

### 2. Narrowness of the Order

It is axiomatic that the limitation on First Amendment freedoms must be "no greater than is essential to the protection of the particular governmental interest involved." *Procunier v. Martinez*, 94 S.Ct. 1800, 1811 (1974). We find that the gag order in the present case is sufficiently narrow to eliminate substantially only that speech having a meaningful likelihood of materially impairing the court's ability to conduct a fair trial.[17] First, we observe that the district court did not impose a "no comment" rule, but instead left available to the parties various avenues of expression, including assertions of innocence, general statements about the nature of an allegation or defense, and statements of matters of public record. The district court also made special allowances for Brown's re-election campaign by lifting most of the order (with the exception of the wire tap recordings) for the duration of the campaign. Unlike the defendant in *Ford*,

---

[17]Under the circumstances here Brown's attack on the order in this respect is essentially facial and in such a context complained of "'overbreadth . . . must not only be real, but substantial as well, judged in relation to the . . . [order's] plainly legitimate sweep.'" *J&B Entertainment Inc. v. City of Jackson*, 152 F.3d 362, 366 (5th Cir. 1998) (quoting *Broadrick v. Oklahoma*, 93 S.Ct. 2908, 2917-18 (1973)).

who could not comment on his indictment during his re-election campaign because of a court-imposed gag order, *see Ford*, 830 F.2d at 600, Brown was able to answer, without hindrance, the charges of his opponents regarding his indictment throughout the race. We do not find compelling Brown's argument that his newly re-elected position as Insurance Commissioner requires him, for the good of the state insurance industry and the people of Louisiana, to engage in the same unfettered dialogue about the charges pending against him. The urgency of a campaign, which may well require that a candidate, for the benefit of the electorate as well as himself, have absolute freedom to discuss his qualifications, has passed. Accepting Brown's argument would essentially create an exception to gag orders for any trial participant holding elected office or any position of public importance. We see no reason why Brown cannot continue to perform his duties as Insurance Commissioner by assuring the public and various insurance companies that he will prevail at trial. "Bearing the discomfiture and cost of a prosecution for crime even by an innocent person is one of the painful obligations of citizenship." *Cobbledick v. United States*, 60 S.Ct. 540, 541 (1940).

Second, despite Brown's arguments to the contrary, the order provides sufficient guidance regarding the nature of the prohibited comments. A restraining order of any type is unconstitutionally vague if it fails to give clear guidance regarding the type of

31

speech that an individual may not utter. *See Smith v. Goguen*, 94 S.Ct. 1242, 1246-47 (1974) (cited in *Levine*, 764 F.2d at 599). The order in the present case does not suffer from such a shortcoming. It specifically designates "[s]tatements or information intended to influence public opinion regarding the merits of this case" as matters the parties may not share with the public media. We see no reason to believe that the parties in this case would not understand the meaning of these words. *See Levine*, 764 F.2d at 598-99 (finding that an order barring trial participants from making any statements to members of the news media concerning any aspect of this case that bears "upon the merits to be resolved by the jury" not vague).

Moreover, Brown's complaints that the order is overbroad or too vague are weakened by the fact that he did not take the district court up on its invitation to submit suggested modifications of the order. Instead, Brown insisted that he be completely exempt from any restrictions on extrajudicial comments. He never sought clarification. If he had been so concerned about the scope of the order, he should have communicated those concerns to the district court as he was given ample opportunity, and indeed invited, to do.

In short, while the language of the order is arguably somewhat broad, under the circumstances we do not find it to be so vague or overinclusive as to unjustifiably trammel on Brown's free speech

32

rights.

### C. Least Restrictive Means

In *Nebraska Press*, the Supreme Court indicated that "[t]he more difficult prospective or predictive assessment that a trial judge must make" when considering whether to impose a gag order as a remedy for potentially prejudicial pretrial publicity "calls for a judgment as to whether other precautionary steps will suffice." 96 S.Ct. at 2805. This requirement appears to comport with the more general First Amendment principle that restrictions on speech should employ the least restrictive means possible. *See*, *e.g.*, *Procunier*, 94 S.Ct. at 1811. As noted above, *Sheppard* suggested several alternatives to imposing prior restraints on the press, such as change of venue, jury sequestration, "searching" voir dire, and "emphatic" jury instructions, as tools for dealing with extensive pretrial publicity; *Nebraska Press* held that trial courts should use these alternatives, whenever possible, instead of gagging the press. *See Nebraska Press*, 96 S.Ct. at 2805.

The district court did not on the record explicitly discuss and reject each of the *Sheppard* options before imposing the gag order on Brown and the other trial participants; this order was, of course, another of the less restrictive alternatives proposed in *Sheppard*. While it is undoubtedly good judicial practice for district courts to explicitly set forth on the record their consideration of such matters, we do not believe that this

33

shortcoming requires us to vacate the present order. *See Nebraska Press*, 96 S.Ct. at 2806 (in the absence of such a discussion by the trial court, examining the record to determine the efficacy of measures short of a gag order on the press); *Russell*, 726 F.2d at 1010 (concluding that the district court's order was not "rendered unconstitutional because of the alleged lack of an 'evidentiary finding' or of specific, articulated findings" and reviewing the record to find support for the determination that a gag order on trial participants was necessary). *But see Dow Jones*, 842 F.2d at 611 (requiring that "each [alternative measure] must be explored and ultimately rejected as inadequate–individually and in combination–as a remedy for prejudicial pretrial publicity before a restraining order [on the press] is entered").

The record sufficiently supports the district court's clearly implied conclusion that the other measures suggested by *Sheppard* and *Nebraska Press* would be inappropriate or insufficient to adequately address the possible deleterious effects of enormous pretrial publicity on this case and the two related cases. As the Supreme Court noted in *Gentile*, even "[e]xtensive voir dire may not be able to filter out all of the effects of pretrial publicity, and with increasingly widespread media coverage of criminal trials, a change of venue may not suffice to undo the effects of statements" by trial participants. *Gentile*, 111 S.Ct. at 1075. Like voir dire, "emphatic" jury instructions may be at best an imperfect

34

filter, and would also fail to address the threat of a "carnival atmosphere" around the trial. *See Levine*, 764 F.2d at 600. Delaying the commencement of the trial and sequestering the jury both impose well-known and serious burdens in their own right and would not have prevented, in any meaningful way, the infection of jurors in the two related trials. For example, even if the district court had sequestered the jury in this case, the comments by the parties would still threaten to prejudice the jurors in the other trials. In short, all of these options carry with them significant costs without addressing the root cause of the district court's concern. *See Gentile*, 111 S.Ct. at 1075 (noting that "voir dire, change of venue, or some other device . . . entail serious costs to the system [which] [t]he State has a substantial interest" in avoiding). The *Sheppard* Court observed that when considering how to "cure" the effects of pretrial publicity, a trial court's overriding object must be to institute "those remedial measures that will prevent the prejudice at its inception." *Sheppard*, 86 S.Ct. at 1522. In light of the parties' and attorneys' demonstrated enthusiasm for using the press to their utmost advantage, the district court made a reasoned and reasonable decision to focus its prophylactic attempt to avoid prejudicing the three related trials on the trial participants. Given the difficult and "necessarily speculative" task of trying to prevent prejudice that has not yet occurred–a task that involves the

35

weighing of "factors unknown and unknowable"–we do not believe that the district court erred in imposing the gag order on Brown and the other trial participants in this case. *Nebraska Press*, 96 S.Ct. at 2804.

## Conclusion

The district court's denial of Brown's motion to modify or vacate the order is AFFIRMED.