_____

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 00-30953
cons/w 00-31042 and
00-31179
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES HARVEY BROWN, also known as Jim Brown; ALFRED FOSTER
SANDERS, III, also known as Foxy Sanders; EDWIN W. EDWARDS,
also known as The Governor; ROBERT A. BOURGEOIS, also known
as Bob Bourgeois, DAVID JUDD DISIERE, RONALD R. WEEMS, also
known as Ron Weems,

Defendants-Appellees,

versus

THE TIMES PICAYUNE PUBLISHING CORPORATION; ASSOCIATED PRESS;
CAPITAL CITY PRESS; HEARST-ARGYLE TELEVISION, INC.; THE
LOUISIANA PRESS ASSOCIATION,

Appellants.

_____

00-31284

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES HARVEY BROWN, Etc; ET AL,

Defendants,

JAMES HARVEY BROWN, also known as Jim Brown; EDWIN
WASHINGTON EDWARDS, also known as The Governor; RONALD R.
WEEMS, also known as Ron Weems,

Defendants-Appellees,

versus

TIMES PICAYUNE PUBLISHING CORPORATION; CAPITAL CITY PRESS,
the Advocate, Saturday and Sunday Advocate, the "News Media",

Appellants.

_____

Appeals from the United States District Court
for the Middle District of Louisiana
_____


_____

00-31069
_____


In Re: THE TIMES-PICAYUNE PUBLISHING CORPORATION; THE
ASSOCIATED PRESS; CAPITAL CITY PRESS, INC., (The Advocate,
Saturday and Sunday Advocate); HEARST-ARGYLE TELEVISION
INC. (WDSU-TV); THE LOUISIANA PRESS ASSOCIATION,

Petitioners,


_____

2

_____

**In Re: HEARST-ARGYLE TELEVISION INC. (WDSU-TV); CAPITAL CITY PRESS (The Advocate, Saturday and Sunday Advocate); THE TIMES-PICAYUNE PUBLISHING CORPORATION,**

**Petitioners.**

_____

Petitions for Writ of Mandamus
to the United States District Court
for the Middle District of Louisiana
_____
May 1, 2001

Before JOLLY, JONES and SMITH, Circuit Judges.

EDITH H. JONES, Circuit Judge:

By appeals or, in the alternative, petitions for a writ of mandamus, various "News Media",[1] challenge measures used by the court to protect juror anonymity in a much-publicized criminal trial. Those measures included certain orders implementing an anonymous jury order, and the district court's refusal to grant the News Media's motion for post-verdict access to juror information. Finding that a portion of the district court's orders supplementing its anonymous jury order was an unconstitutional prior restraint, we reverse in part. We reject, however, the News Media's requests

_____

[1] The "News Media" include Times-Picayune Publishing Corporation, the Associated Press, Capital City Press, Inc., Gannett River States Publishing, Inc., Hearst-Argyle Television, Inc. (WDSU-TV), WGNO Inc., WWL-TV Inc., Emmis Television Broadcasting L.P. (WVUE-TV) and the Louisiana Press Association.

that the district court be ordered to release the jurors' identifying information and juror questionnaires.

## I. BACKGROUND

Former Louisiana Governor Edwin Edwards and several others, including state Insurance Commissioner Jim Brown, were indicted for various federal crimes allegedly committed in connection with a "'sham settlement' that derailed a $27 million lawsuit threatened by the state against David Disiere, president of Cascade Insurance Co., a failed automobile insurance carrier." United States v. Brown, 218 F.3d 415, 418 (5th Cir. 2000). The indictment included numerous counts of conspiracy, mail and wire fraud, insurance fraud, making false statements, and witness tampering. The trial at issue in this appeal was the second of three federal prosecutions involving former Governor Edwards. In the first trial, Edwards and several other defendants were convicted in June, 2000, of charges based on bribery to obtain a riverboat gambling license. The third trial, also involving bribery allegations, was held in March, 2001. The jury convicted Cecil Brown on seven out of nine counts. Edwards was an unindicted co-conspirator in that case and appeared as a witness for Brown.[2]

Trial on this second indictment began on September 18, 2000. On October 11, Edwards and Shreveport lawyer Ronald Weems

---

[2] A fourth related trial for federal tax evasion by former Edwards aide Andrew Martin will commence in July, 2001.

4

were acquitted of all charges. Brown was acquitted on most charges but convicted on seven counts of making false statements to an FBI agent. The district court threw out two of these counts.

## A. Pretrial Proceedings

On March 31, 2000, the United States filed a motion for the impanelment of an anonymous jury. The defendants opposed the motion. On July 13, the district court continued the trial until September 18, 2000, and it granted the Government's motion for an anonymous jury.

The News Media, as intervenors, requested on July 26 that the district court reconsider its approval of an anonymous jury. In the alternative, the News Media asked for access to the names, addresses, and places of employment of the jurors upon entry of the verdict, to the extent that the information might be withheld during trial.

The district court issued reasons for granting the anonymous jury motion on August 9. Stating that anonymity has long been an important element of the jury system, the court reasoned that its order "merely increased the degree of anonymity by withholding the jurors' names, addresses, and places of employment." The court found that three of five non-exclusive

5

factors[3] that the Fifth Circuit has stated may justify impaneling an anonymous jury were present in this case. First, there have been charges that the defendants have attempted to interfere with the judicial process or witnesses through witness tampering, attempting to bribe a judge, attempting to illegally terminate a federal investigation and influencing a court-appointed special master. Two of the defendants have pled guilty to witness tampering, another to misprision of a felony. In addition, Edwards was convicted in the first trial of interfering with Louisiana's judicial and administrative processes for licensing riverboat casinos.

Second, the district court stated that an anonymous jury is appropriate when defendants face a lengthy incarceration and substantial monetary penalties, as they did here. Third, this case has received extensive publicity, enhancing the "possibility that jurors' names would become public and expose them to intimidation and harassment." Krout, 66 F.3d at 1427. In addition, in the previous Edwards trial, "despite extensive and expensive precautions by the United States Marshals Service to protect the

---

[3] As discussed in United States v. Krout, the five factors are: "(1) the defendants' involvement in organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and, (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment." 66 F.3d 1420, 1427 (5th Cir. 1995).

6

anonymity of the jury, certain members of the media aggressively followed, identified, and contacted jurors in violation of the anonymous jury order. . . ."  Therefore, the district court concluded, "the media's intense interest in gaining access to the jurors' names, addresses, and place of employment strongly counsels the Court to protect the panel from foreseeable harassment by the media and others."  The district court continued: "Any attempts by the media or others to interfere with this order will not be tolerated."

On August 10, the district court denied the Media's motions for reconsideration of the anonymous jury order and deferred ruling on the media's alternative motion for access to jury information upon entry of verdict but stated that "[i]n the meantime, the media is ordered not to attempt to circumvent this Court's ruling preserving the jury's anonymity."

The News Media promptly appealed, challenging: (1) the district court's August 9, 2000 Order to the extent it stated that "any attempt by the media or others to interfere with this Order will not be tolerated"; (2) the district court's August 10, 2000 minute entry stating that "the media is ordered not to circumvent this Court's ruling preserving the jury's anonymity"; and (3) the district court's minute entry of August 10, 2000 indefinitely deferring the News Media's request for post-verdict access to the jurors' names, addresses, places of employment and the juror

7

questionnaires.[4]  The News Media do not, however, challenge the substantive merit of the anonymous jury order.

**B.    The Trial and Its Aftermath**

Voir dire began on September 18, 2000.  After the district court closed portions of the jury voir dire, the News Media sought a writ of mandamus ordering the district court to open the voir dire proceedings to the public and the press and to transcribe immediately and release any portion of voir dire held behind closed doors.  The district court entered its reasons for closing the voir dire on September 19, 2000.  On October 3, the News Media filed a notice of appeal regarding the same matter.

On October 11, before the verdict was announced, the district court told the jurors that it was not going to release their identities unless they wished to waive or release themselves from anonymity.  The trial judge also informed the jurors that they did not have to speak to anyone about the case and that, absent court order, they could not be interviewed about the jury deliberations, but that they could discuss their general reactions to the trial.  When asked by the district court whether they wished to waive anonymity, none of the jurors indicated a desire to do so. However, the judge stated that if any juror later sought to be

_____

[4]      On September 5, the News Media filed a mandamus petition challenging the same orders.  This court consolidated the writ of mandamus with the aforementioned appeals.

8

released from the confidentiality agreement, the court would put an order in the record identifying the person.

The News Media immediately sought a post-verdict writ of mandamus ordering the district court to release the names, addresses and places of employment of the anonymous jurors and the completed juror questionnaires that were sealed during the trial. In the alternative, the News Media also filed a notice of appeal.

On October 16, the court granted a motion to unseal the transcript of the closed voir dire.[5] The district court denied the News Media's motion for access to juror questionnaires, however, on the grounds that the questionnaires assured the jurors that all information would remain confidential and that the court would not breach this confidentiality agreement. The court offered to release the questionnaires of consenting jurors, but it again refused to release jurors' names, addresses, and places of employment (without their consent). Further, the court repeated that if any juror requested to be released from the confidentiality agreement, the court would place an order in the record identifying the juror. The News Media have appealed and sought mandamus to reverse these orders.

---

[5] The district court's order granting the motion to unseal the transcript of the closed voir dire renders moot the mandamus petition of September 18, 2000.

9

The court went to extraordinary lengths to preserve the integrity of the jury system and conduct a fair trial in the face of relentless publicity, some of it generated by the parties themselves. Eager media have entertained the citizens of Louisiana and beyond with nonstop coverage of the current prosecutions of Louisiana's colorful ex-Governor. The court's protective measures in this trial included: (1) a gag order on all trial participants;[6] (2) an anonymous, but not sequestered jury; (3) closure during trial of the jury selection process; (4) the August 9 and 10 orders that admonished against any attempt to circumvent or interfere with the anonymous jury order; and (5) post-verdict orders that (a) continue, until each individual juror requests otherwise, the confidentiality of juror identity and questionnaires, and (b) shroud the jury deliberations. These orders have not noticeably interfered with vigorous press coverage, except to limit inquiry into the background and makeup of the jury. Among all these orders, the News Media appealed the (now-moot) closure of jury selection, the non-circumvention orders and the post-verdict juror identification orders.[7] They argue in addition that the

---

[6] The gag order on trial counsel, defendants and potential witnesses in this second Edwards trial was upheld after an appeal by defendant Harvey Brown in United States v. Brown, *supra*. The News Media appeared as amici in that appeal.

[7] Following oral argument, on October 6, 2000, this court dismissed without prejudice, on grounds of prematurity, that portion of the News Media's appeal/mandamus petition challenging the indefinite deferral of their motion for post-verdict access to juror information. The issue is again before us on appeal

10

cumulative effect of all the protective orders denied public access to the trial. Each of the News Media's issues deserves close attention.

## II.  DISCUSSION

Because this case involves constitutional and other legal questions, we review the district court's orders *de novo*. *See* American Civil Liberties Union of Mississippi, Inc. v. Mississippi, 911 F.2d 1066, 1069 (5th Cir. 1990). "Specific factual findings of the district court on the issue are, of course, entitled to review under the clearly erroneous standard." *Id.*

### A.  The District Court's Orders that the Media Not Circumvent Its Anonymous Jury Order[8]

---

after the court entered its post-verdict juror identification orders.

[8]     At the outset, we must consider whether the non-circumvention order is moot and whether our jurisdiction is defeated. Two conditions must be satisfied in such a case for jurisdiction to be valid and the order considered not moot: "'(1) the challenged action [must] in its duration [be] too short to be fully litigated prior to its cessation or expiration, and (2) there [must be] a reasonable expectation that the same complaining party would be subjected to the same action again.'"  Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 377, 99 S.Ct. 2898, 2904 (1979)(quoting Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 349 (1975).  Considering an order prohibiting the public and press from a pretrial suppression hearing, the Supreme Court concluded in Gannett that it had jurisdiction to review such a controversy and that the case was not moot. *Id.* The Court stated that a pretrial hearing was too short in duration to permit full review and that an order denying access to a transcript would nearly always be lifted prior to the completion of appellate review.  The Court also concluded that it was reasonable that the petitioner, a newspaper publisher, would be subject to similar closure orders in the future.  *Id.* Likewise, in Nebraska Press Assoc. v. Stuart, 427 U.S. 539, 96 S.Ct. 2791 (1976), the Court reviewed an order restraining the news media from publishing or broadcasting accounts of confessions or admissions.  The Court held that the controversy was "capable of repetition" because the defendant's conviction could be reversed and the trial court could issue "another restrictive order to prevent a resurgence of prejudicial publicity before [the defendant's] retrial." *Id.* at 546, 96 S.Ct. at 2797. Because similar circumstances exist here, we likewise conclude that the controversy is neither moot nor our jurisdiction defeated.  This is a

11

This is the first time an appellate court has been asked to consider how far a trial court may go, consistent with the First Amendment, in enforcing an order on juror anonymity. The News Media contend that the district court's orders amounted to a prior restraint, "freezing" their publication of information about the jurors and juror conduct that might arise during trial. <u>Nebraska Press Ass'n v. Stuart</u>, 427 U.S. 539, 559, 96 S.Ct. 2791, 2803 (1976). The government responds that since the court's orders intended no more than to prevent publication of information from which the jurors could be identified, they fell within the court's broad discretion to manage the trial.

Between the parties' positions lies an area of agreement: the court could determine that maintaining jury anonymity was

_____

"controversy . . . capable of repetition under circumstances in which each repetition may evade review." <u>United States v. Chagra</u>, 701 F.2d 354, 358 (5th Cir. 1983).

In addition, our appellate jurisdiction lies under the collateral order doctrine. "Congress has limited the jurisdiction of this Court to 'final decisions of the district courts.'" <u>U.S. v. Brown</u>, 218 F.3d 415, 420 (5th Cir. 2000). Although the district court's orders are not final orders, the Supreme Court has recognized a collateral order exception to this final order requirement because "certain decisions of the district court are final in effect although they do not dispose of the litigation." <u>Davis v. East Baton Rouge Parish Sch. Bd.</u>, 78 F.3d 920, 925 (5th Cir. 1996). Such orders may be appealed "if they (1) are conclusive, (2) resolve important questions that are separate from the merits, and (3) are effectively unreviewable on appeal from the final judgment in the underlying action." <u>Brown</u>, 218 F.3d at 420. Courts have applied this doctrine to appeals of orders affecting the media's First Amendment rights. *See, e.g.*, <u>United States v. Gurney</u>, 558 F.2d 1202, 1206-07 (5th Cir. 1977). The challenge to the district court's orders meet these criteria because: (1) the orders were conclusive "with no further consideration . . . contemplated," <u>Gurney</u>, 558 F.2d at 1206; (2) they involve important questions unrelated to the merits of the case; (3) and the issues would otherwise essentially be unreviewable on appeal from the final judgement.

necessary to prevent extraneous harassment and intimidation of jurors. It could enter an order preventing court personnel from disclosing, or the media from eliciting official court records that would identify the jurors. The News Media have conceded these points by not appealing the anonymous jury order itself. We must assume that that order, unusual as it is, was both fully supported in the record and fully enforceable against parties within the court's control.[9]

The media assert, however, that the non-circumvention orders threaten also to proscribe independent newsgathering, *e.g.* any story not derived from confidential court records, that might deal with jurors. While this is a self-justifying argument, to the extent that the media never properly sought clarification of the orders,[10] it is not without force. The language of the court's orders, which restricts "interference" and "circumvention", is ambiguous. Alternatively, it may connote "not going around" either the substance of the order, *i.e.* by destroying juror anonymity, or

---

[9] *Compare* 28 U.S.C. § 1863(b)(7) (a jury plan "may . . . permit . . . [the court] to keep these [jurors'] names confidential in any case where the interests of justice so require.").

[10] We decline to consider self-serving correspondence that the media sent the trial court in an effort to clarify the judge's non-circumvention orders. Neither such correspondence, nor the court's alleged oral interpretation of the order, is part of the record. The motion to supplement the record to include this correspondence is denied.

13

the integrity of court procedures, *i.e.* by obtaining confidential court data.

The latter interpretation poses no problem.  While the news media are entitled to receive, investigate and report on all *public* proceedings involved in a trial, the right to gather news, much like other first amendment rights, is not absolute. *See* In re Express News Corp., 695 F.2d 807, 809 (5th Cir. 1982) (citing Zemel v. Rusk, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281 (1965)).  It does not "guarantee journalists access to sources of information not available to the public generally." *Id*.  (citing Branzburg v. Hayes, 408 U.S. 665, 684, 92 S.Ct. 2646, 2658 (1972)); *see also* United States v. Gurney, 558 F.2d 1202, 1208 n.9 (5th Cir. 1977)("'When representatives of the communications media attend trial they have no greater rights than other members of the public.'") (quoting Estes v. Texas, 381 U.S. 532, 584, 85 S.Ct. 1628, 1654 (1965) (Warren, C.J., concurring)).  As this court has held, a trial court may refuse to allow the media to inspect documents not a matter of public record, including jurors' names and addresses; such orders are distinct from prior restraints. Gurney, 558 F.2d at 1210.  To the extent the orders warned the media not to publish information illegally gleaned from confidential court files, it was justified.  *See* Florida Star v.

14

<u>BJF</u>, 491 U.S. 524, 534, 109 S.Ct. 2603, 2609 (1989).[11] Similarly, although the media generally have a right to publish information that they obtain, "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." <u>Houchins v. KQED, Inc.</u>, 438 U.S. 1, 15, 98 S.Ct. 2588, 2597 (1978).

If the court intended the former connotation, however, then it could be tricky to determine how much information revealed in an independently gathered news article might compromise juror anonymity. Nevertheless, a violation of the orders would subject the press to sanctions. The orders thus plausibly constituted a

---

[11] In <u>Florida Star v. BJF</u>, 491 U.S. 524, 109 S.Ct. 2603 (1989), the Court held that imposing damages on a newspaper for publishing the name of a rape victim violated the First Amendment. In so doing, however, the Court refused to hold broadly that truthful publication may never be punished consistent with the First Amendment. <i>Id</i>. at 532, 109 S.Ct. at 2609 ("Our cases have carefully eschewed reaching this ultimate question, mindful that the future may bring scenarios which prudence counsels our not resolving anticipatorily."). Rather, the government "retains ample means of safeguarding significant interests upon which publication may impinge." <i>Id</i>. at 533, 109 S.Ct. at 2609. This includes protecting anonymity.

> To the extent sensitive information rests in private hands, the government may under some circumstances forbid its non-consensual acquisition. . . . To the extent sensitive information is in the government's custody, it has even greater power to forestall or mitigate the injury caused by its release. The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination.

<u>Florida Star</u>, 491 U.S. at 534, 109 S.Ct. at 2609. In <u>Florida Star</u>, the imposition of damages was unconstitutional in part because the government itself made the information available to the media.

prior restraint because it gagged the press from reporting some kinds of independently gathered stories pertinent to the trial.[12]

Prior restraints on publication by the press are constitutionally disfavored in this nation nearly to the point of extinction. To avoid redundancy in the case reports, we forbear repeating the background and caselaw that compel this conclusion under the First Amendment. *See generally* <u>Nebraska Press Ass'n v. Stuart</u>, 427 U.S. 539, 96 S.Ct. 2791 (1976); <u>Brown</u>, *supra*. But vital as it is to protect freedom of the press, especially in reporting about the criminal justice system,[13] the rights of the press may collide with a criminal defendant's equally significant Sixth Amendment right to a fair trial. "In general, a prior restraint (usually directed at the press) will be upheld only if the government can establish that 'the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest.'" <u>Brown</u>, 218 F.3d at 424 (citing <u>Levine v. U.S. Dist. Court</u>, 764 F.2d 590, 595 (9th Cir. 1985) (citations omitted)). In <u>Nebraska Press</u>, the Supreme Court examined a restraint against pretrial publication of certain

---

[12] "A prior restraint . . . has an immediate and irreversible sanction. If it can be said, that a threat of criminal or civil sanctions after publication "chills" speech, prior restraint 'freezes' it at least for the time." <u>Nebraska Press</u>, 427 U.S. at 559, 96 S.Ct. at 2801.

[13] *See generally* <u>Sheppard v. Maxwell</u>, 334 U.S. 333, 86 S.Ct. 1507 (1966).

evidence inculpating the defendant. The state courts had intended to stanch excessive publicity that might taint a small town's jury pool. The Court examined the evidence before the trial judge to determine "(a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and (c) how effectively a restraining order would operate to prevent threatened danger." 427 U.S. at 562, 96 S.Ct. at 2804. The district court's non-circumvention orders in this case must be examined by the Nebraska Press criteria.

In Nebraska Press, the court's gag order was first examined in light of the goal of minimizing prejudicial pretrial publicity. In this Edwards prosecution, by contrast, the court was trying to prevent harassment and intimidation of venire members and jurors by the press and the defendants. Evidence supporting the court's fears of an imminent and serious threat from both these sources was abundant. Two of the defendants had been charged in the indictment and pled guilty to witness tampering and another to misprision of a felony. This particular prosecution involved charges of interfering with state judicial processes through attempted bribery of a judge, attempting illegally to terminate a federal investigation, and influencing a court-appointed special master. In the first Edwards prosecution, allegations that the former Governor and his son bugged the office of an FBI agent had

17

been severed for separate trial. Edwards was convicted in the first trial of interfering with Louisiana's judicial and administrative processes for licensing riverboat casinos. During the first trial, the media had identified and pursued jurors and attempted to interview them despite an anonymity order. Repeated allegations of juror misconduct were raised in the first trial, necessitating inquiries by the court concerning possible outside influences on those jurors. In this prosecution, the media zealously sought to access sealed information. Finally, when Governor Edwards was tried on criminal charges several years ago, there was evidence of possible attempts to influence jurors through their relatives. The district court could well conclude that the integrity and independence of the jury process were at risk.

Protecting against these unique threats to the integrity of the jury process posed a significant challenge in addition to and different from the relatively well-charted field of excessive pretrial publicity. To a greater extent than in Nebraska Press, then, the trial court could justifiably find a clear and present danger to the integrity of the jury process if juror anonymity were compromised.

Because the fair trial threat in this case originates from different sources from that in Nebraska Press, the evaluation of less restrictive means, the second of the Supreme Court's criteria, must also differ. In Nebraska Press, the Court

18

enumerated several alternatives that would minimize the effect of excessive publicity short of gag orders on the press. Those alternatives included imposing gag orders on trial participants, granting a change of venue, delaying the trial, or sequestering jurors. In Brown, this court has already upheld a gag order on the trial participants in the second Edwards trial, while emphasizing the determined efforts of defendants and all counsel to circumvent it.

For purposes of combating direct intimidation by the press or the defendants, however, the only obvious alternative to enforcing juror anonymity seems to be sequestration. Because the media did not challenge the anonymous jury order, they should not be able to back into the issue with a collateral attack. And in any event, "sequestering the jury imposes well-known and serious burdens." Brown, 218 F.3d at 431. Moreover, juror anonymity and sequestration are remedies for overlapping but distinct problems.[14] Sequestration protects the jury from trial publicity, extraneous influences and harassment. *See e.g.,* Mayola v. State of Ala., 623 F.2d 992, 1002 (5th Cir. 1980); United States v. Harris, 458 F.2d

---

[14] The ABA Standards for Criminal Justice Fair Trial and Free Press states, in its section about the conduct of a criminal trial when problems relating to the dissemination of potentially prejudicial materials are raised, that "[a]s an alternative to sequestration in a case where there is a significant threat of juror intimidation during or after the trial, the court may consider an order withholding public disclosure of jurors' names and addresses as long as that information is not otherwise required by law to be a matter of public record." ABA Standards, § 8-3.6(b).

670, 674 (5th Cir. 1972)("The purpose of sequestering is, the cases agree, to protect the jury from interference."). Anonymity protects, in addition to the jurors, the venire persons and the jurors' families from influence exerted by outside parties. *See* Krout*,* 66 F.3d at 1427 ("'[T]he use of an anonymous jury is constitutional when, 'there is strong reason to believe the jury needs protection' and the district court 'tak[es] reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.'")(quoting United States v. Wong, 40 F.3d 1347, 1376 (2d Cir. 1994)). To insist on a sequestered, but not anonymous, jury in this case would not necessarily have prevented undue influence being brought to bear through harassment of jurors' families. Sequestration is an imperfect alternative to address the court's particular concerns about juror intimidation in this case.

The third factor discussed in Nebraska Press was the efficacy of the prior restraint. The Supreme Court demonstrated that the Nebraska courts' order preventing publication of certain inflammatory information was overbroad, unenforceable, and unlikely to fulfill its purpose. On examination, this is the Achilles heel of the district court's noncircumvention orders. In the instant case, the gag order is generally, though not fully, enforceable, since acts that would compromise a juror's anonymity would almost

20

surely take place within the court's jurisdiction, no matter where publication occurred.[15] But the district court could not punish every potentially offending publication outside its jurisdiction. Moreover, the court's orders are overbroad, based on the ambiguity of the terms "circumvent" and "interfere" and the various gradations of information that, if published, might conceivably reveal a juror's identity. The orders may also ultimately fail to achieve their purpose; restraining the press from independent investigation and reporting about the jurors would not necessarily deter defendants who have already manifested a willingness to tamper with court processes. Just as obviously, however, enforcing a prior restraint on the press would make it more difficult for the defendants to obtain information compromising juror integrity. Without a prior restraint on these overeager media representatives, juror anonymity might not be enforceable at all.

With considerable doubt, we conclude that under the standards of <u>Nebraska Press</u>, particularly the requirement that a court's prior restraint order be narrowly efficacious, the noncircumvention orders were unconstitutional insofar as they interdicted the press from independent investigation and reporting about the jury based on facts obtained from sources other than

---

[15]    There is of course the possibility that a member of the media might innocently, and without knowledge of the court's noncircumvention order, publish information that violated the anonymity of jurors, but we need not hypothesize so far for purposes of this case.

21

confidential court records, court personnel or trial participants.
Our doubt is based on the uncertainty whether the press would have
cooperated with an anonymous jury order whose enforceability was so
limited.  Can it be that the First Amendment prevents a court from
fully enforcing orders it strongly believes necessary to protect
jurors, the jury system and the defendant's fair trial rights?
Since the Supreme Court has not in recent history upheld any limit
on the press,[16] we decline to be the first court to do so.  We also
hope that the press understand that their enormous power under the
First Amendment should be tempered with respect for the judicial
system that protects the press as well as criminal defendants and
that inherent in such respect there should be deference to the
spirit of the court's anonymous jury order.

B.     **The Order Denying Post-Verdict Access to Juror Information**

The News Media assert that there is no compelling reason
justifying continued "secrecy" about the jurors.  In particular,
they submit that the district court's reason for not releasing
jurors' names and addresses - its promise of confidentiality - is
insufficient, and the "severe restriction" on the News Media's
ability to contact jurors is not narrowly tailored to prevent a
substantial threat to the administration of justice.  Since the
judicial system is presumptively open, access to information about

---

[16]     Apart from *dicta* in Florida v. BJF - *supra*.

jurors cannot be denied absent extraordinary circumstances.  We disagree with this characterization of the court's reasoning, the News Media's interpretation of the scope of the court's order, and their reading of caselaw.

Tensions between First Amendment rights and the right of an accused to trial by an impartial jury frequently develop in a "sensational" case like this. Nebraska Press, 427 U.S. at 551, 96 S.Ct. at 2799.  While a denial of access to confidential court information may hamper newsgathering, this burden is thought to be incidental when strong governmental interests are involved. Gurney, 558 F.2d at 1209.  Ensuring that jurors are entitled to privacy and protection against harassment, even after their jury duty has ended, qualifies as such an interest in this circuit. United States v. Harrelson, 713 F.3d 1114, 1116 (5th Cir. 1983); Express News, 695 F.2d at 810;  Gurney, 558 F.2d at 1210 n.12 ("[T]he judge was following a well-established practice when he refused to publicly release the jury list, which included the names, addresses, and other personal information about the jurors. Such protection of the privacy of the jurors was clearly permissible, and certainly appropriate in a trial which attracted public attention as this one did.").[17] The judge's power to prevent

_____

[17]    We note that in Press-Enterprise Co. v. Superior Court of California, the Supreme Court held that a trial court could not constitutionally close all but three days of six weeks of voir dire to protect privacy interests of prospective jurors without considering alternatives to closure and articulating

23

harassment and protect juror privacy does not cease when the case ends. <u>Harrelson</u>, 713 F.2d at 1117; *see also* <u>United States v. Edwards</u>, 823 F.2d 111, 120 (5th Cir. 1987)("[A]lthough post-trial restrictions on news gathering must be narrowly tailored, the jurors are entitled to privacy and protection from harassment even after completing their duties.").

The News Media preliminarily complain that the district court did not issue findings that support continued juror anonymity. Specific findings are not required in this circuit where the reasons for the court's decision are obvious and compelling. In a case where a district court placed restrictions on proposed interviews with discharged jurors, this court stated that there was no need for the district court judge to hold hearings[18] before issuing such an order, especially in a highly

_____

findings to support the broad order. 464 U.S. 501, 510, 104 S.Ct. 819, 824 (1984). The Court, however, was concerned with the broad sweep of the closure order and stated that the trial judge could seal "such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected." *Id*. at 513, 104 S.Ct. 825-26. Applying <u>Press-Enterprise</u>, in <u>Edwards</u> this court stated that "the <u>Press I</u> Court instructed that redaction of juror names or portions of the transcript may constitute a reasonable alternative to safeguard jurors from unwarranted embarrassment and yet preserve the competing interests served by disclosure." <u>Edwards</u>, 823 F.2d at 120. Likewise, this court rejects the News Media's argument that "'minor discomfort' of jurors does not warrant the level of solicitude afforded the jurors in Press I," finding instead that the "usefulness of releasing jurors' names appears to us highly questionable." *Id*.

[18] The ABA Standards for Criminal Justice Fair Trial and Free Press state that a court may issue a closure order denying access to specified portions of judicial proceedings or related documents only after the parties and the public are provided reasonable notice and an opportunity to be heard. ABA Standards, § 8-3.2(b)(1). In addition, the standards state that the court should

24

publicized case.  <u>Harrelson</u>, 713 F.2d at 1117.  "A federal judge is not the mere moderator of a jury trial; he is its governor for the purpose of insuring its proper conduct."  *Id.*  The trial court has broad discretion, "'based on law and on his own and common experience,' over aspects of the trial concerning the 'handling of jurors,' *e.g.* sequestration, juror access to information, and 'harassment of jurors."  <u>Edwards</u>, 823 F.2d at 116 (quoting <u>Harrelson</u>, 713 F.2d at 1117); *see also* <u>Gurney</u>, 558 F.2d 1202, 1209 ("Within this discretion, therefore, the district judge can place restrictions on parties, jurors, lawyers, and others involved with the proceedings despite the fact that such restrictions might affect First Amendment considerations.").  The district court's order maintaining a level of post-verdict juror anonymity must be

make specific findings that: "(A) unrestricted access would pose a substantial probability of harm to the fairness of the trial or other overriding interest which substantially outweighs the defendant's right to a public trial; (B) the proposed order will effectively prevent the aforesaid harm; and (C) there is no less restrictive alternatively reasonable available to prevent the aforesaid harm."  The Reporter's Key to the standards makes clear that the principle of access extends to jury selection, although it does not indicate whether this section applies to the release of information regarding anonymous jurors.  The Reporter's Key accompanying that section of the standards governing the selection of a jury, Standard § 8-3.5, discusses whether a court may restrain the press from knowing and/or publishing the names and addresses of jurors.  The Reporter's Key suggested that "[c]ourts may withhold jurors' names and addresses upon particularized findings that 'the interests of justice so require.'" However, "[t]he mere desire of jurors to maintain privacy is not enough to support a decision to withhold names and addresses."  Reporter's Key to ABA Standard § 8-3.2, http://www.abanet.org/media/nclm.  This court's cases have afforded greater discretion to the district court than the ABA Standards recommend.  Although this court takes these recommendations into consideration, we are not bound by them and have previously declined to follow them. *See* <u>United States v. Capo</u>, 595 F.2d 1086, 1092 n.6 (5th Cir. 1970) (refusing to adopt an ABA Standard regarding jurors exposed to pre-trial publicity because it would require that this court invoke its supervisory powers where the trial court took appropriate measures).

25

placed in context. It rests on an earlier promise of anonymity, which itself was grounded in well-documented threats by the media and the defendants to jurors' privacy and independence. The drumbeat of publicity surrounding the Edwards prosecutions continues to this day. Requiring the court to recite such details and repeat obvious facts would be a meaningless exercise.[19]

Turning to the scope of the court's order, the News Media overlook that this court refused, in <u>Harrelson</u>, to hold that a district judge abused his discretion by banning repeated requests for post-trial juror interviews where jurors expressed a desire not to be interviewed. <u>Harrelson</u>, 713 F.2d at 1118. There is little practical difference between the <u>Harrelson</u> order and the district court's order in the instant case. Here, the district judge polled the jurors before releasing them from service to ask whether they wished to have their names made public. None desired to waive anonymity. The judge informed the jurors that if anyone later wanted to have his identity released, he could do so. Both orders, though slightly different in mechanism, have the same effect; they protect the jurors from unwanted harassment. As this court has observed:

_____

[19] The cases from other circuits on which the News Media rely for a rule requiring specific findings were invariably those where the trial courts made no effort to support their orders, and the case circumstances did not justify them. *See* <u>U.S. v. Antar</u>, 38 F.3d 1348 (3d Cir. 1994); <u>In re Globe Newspaper Co.</u>, 920 F.2d 88 (1st Cir. 1990); *but compare* <u>U.S. v. Three Juveniles</u>, 61 F.3d 86 (1st Cir. 1995) (upholding federal statute allowing closure of federal prosecutions involving juveniles).

> [c]ommon sense tells us that a juror who has once indicated a desire to be let alone and to put the matter of his jury service behind him by declining to be interviewed regarding it is unlikely to change his mind; and if he does, he is always free to initiate an interview. The court's order does no more than forbid nagging him into doing so.

*Id.* at 1118. Moreover, the district court's order does not ban all media interaction with the jurors, it just allows the jurors to signal their willingness to submit to media contact.[20] Significantly, at least one juror was interviewed following the conclusion of the trial.

The News Media rely principally on this court's decision, In re Express-News Corp., 695 F.2d 807 (5th Cir. 1982), to challenge the district court's post-verdict order limiting jury contact. In Express-News, we vacated a district court rule that categorically forbade interviews of any juror concerning the deliberations or the jury verdict, except by leave of court granted upon good cause shown. *Id.* at 807. Such a restriction could not be imposed on newsgathering "unless it is narrowly tailored to prevent a substantial threat to the administration of justice." 695 F.2d at 810.

---

[20] While the News Media assume that the post-verdict juror anonymity permitted by the court's order violates their right of access to juror identities, what they are really complaining about is the enhanced difficulty of contacting former jurors to interview them. The court's order does not mandate anonymity; it permits it.

27

Express-News marks only the beginning of this court's series of cases on post-verdict access to jurors, however. Recently, this court upheld an order limiting access to jurors. *See* United States v. Cleveland, 128 F.3d 267, 269 (5th Cir. 1997). There, the judge instructed the jurors that they had no obligation to speak to anyone about the case. In addition, she instructed that "absent a special order by me, no juror may be interviewed by anyone concerning the deliberations of the jury. I also instruct you that the lawyers and the parties are not to attempt to question you without an order from me." The order was held sufficiently narrow because it applied only to interviews with the jurors themselves and only concerning their deliberations, but did not apply to the verdict itself. *Id.* at 269. The order did not foreclose "questions about a juror's general reactions," *id.*, nor did it "prevent jurors from speaking out on their own initiative." *Id.* Also in contrast to Express-News, the order did not impose restrictions on post-verdict interviews and then condition those restrictions by requiring "those who would speak freely to justify special treatment by carrying the burden of showing good cause." *Id.* at 270 (quoting Express-News, 695 F.2d at 810). That the order was unlimited in time was not in itself dispositive, because we previously upheld similar restrictions in Harrelson, *supra*. Likewise, the fact that the order applied equally to jurors willing

28

to speak and to those desiring privacy was not decisive.  <u>Cleveland</u> was distinguishable from <u>Express News</u> because it attracted a great deal of media coverage.  *Id.*

The district court's order denying the request for juror identifying information and questionnaires in this case is analogous to the order upheld in <u>Cleveland</u>.  The order is sufficiently narrow.  It has no requirement for a showing of good cause for conducting post-verdict interviews.  It merely states that the court will not release juror information without the juror's consent.  The judge affirmatively asked the jurors whether they wished to relinquish their privacy.[21]  Any juror may, at any time, voluntarily decide to relinquish his confidentiality.  The only restriction placed on such interviews is the court's instruction that jurors may not be interviewed concerning juror deliberations absent a special order from the judge.  This is consistent with our understanding that "[c]ompelling governmental interest[s] in the integrity of jury deliberation require that the

---

[21]     In <u>In the Matter of Dallas Morning News Co.</u>, 916 F.2d 205, 206 (5th Cir. 1990), this court denied a petition for writ of mandamus under a similar set of circumstances.  There, a newspaper requested that this court direct the district court to conduct voir dire proceedings in public, attended by the press. We recommended that the district court, "rather than closing a portion of the voir dire proceeding in anticipation of privacy concerns, . . . inform the prospective jurors carefully, in advance, that any of them may request to be questioned privately . . ." *Id.* at 206.  The judge here followed a similar practice by asking the jurors whether they wished to be released from their confidentiality agreements.

privacy of such deliberations and communications dealing with time be preserved." Gurney, 558 F.2d at 1210-11.

According to this circuit's established caselaw, protecting jurors from post-verdict harassment and invasions of privacy is a legitimate concern. The measures used by the district court, while at the outer limit of permissible restrictions, were narrowly tailored to prevent real threats to the administration of justice, not just in this case but in the subsequent related prosecutions. If jurors voluntarily waive their anonymity and consent to interviews on matters other than jury deliberations, so be it. They need not become unwilling pawns in the frenzied media battle over these cases.

The News Media finally contend that they do not desire simply juror interviews but the basic information revealed by the jurors' names, addresses and still-confidential questionnaires. Juror anonymity, in other words, should have ceased when the trial ended. No caselaw requires this result, and the question appears closely tied to the rationale for initially convening an anonymous jury, an order they did not appeal. Threats of intimidation and harassment do not necessarily end with the conclusion of trial. In these prosecutions, several post-verdict motions have assailed jurors' conduct; without continuing anonymity, jurors would remain vulnerable to abuse by those acting for the defendants. There may be cases where a district court would abuse its discretion by

30

refusing to revoke an order of juror anonymity post-trial, but this is not one of them.

## C. The Synergistic Impact of Closure Orders

Although the News Media failed to challenge the initial jury anonymity order, they nevertheless assert that the closure and gag orders designed to protect the integrity of trial, even if not individually unconstitutional, cumulatively deprived the public of the constitutional openness required in our criminal trials. These orders included (a) the gag order on trial participants, upheld by this Court in Brown, *supra*; (b) the sealing of the juror questionnaires; (c) the initial closure of most of the voir dire hearings; (d) the noncircumvention orders preventing identification during trial of the jurors; and (e) the confidentiality orders protecting the jury after trial. Under the circumstances of this case, they did not.

Very real threats were posed by excessive media coverage, by the trial participants' eagerness to manipulate the News Media, and by the risk of jury harassment and taint. The judge was empowered and entitled to counteract each of these threats in order to assure a fair trial. With the sole exception of the overbroad noncircumvention orders, her actions were appropriate. And as for the public perception of the trial's fairness, it cannot have been harmed. Except for a blackout on the jurors' identities, media

31

coverage of the trial was extensive. The public knew what was going on. They knew that the jury rendered split verdicts, exonerating all but defendant Brown and convicting him only on some of the counts. The public can perceive that the jurors were neither in the prosecution's pocket, nor, because of their anonymity, could they have been improperly influenced by the defendants.[22] The result of the trial seems to belie any contention that the public's rights to a transparent criminal justice system were unconstitutionally compromised.

### III. CONCLUSION

For the foregoing reasons, we first conclude that the district court imposed an unconstitutional restraint to the extent it ordered the News Media not to interfere with or circumvent the anonymous jury order by wholly independent, legal newsgathering. We reverse the district court's orders to that extent and, in light of our disposition, deny the mandamus petition on this matter. Second, the district court's order of October 16 granting the News Media's motion to unseal the transcript of the closed voir dire renders the News Media's petition for writ of mandamus moot on that issue and we deny it without prejudice. Third, we affirm the court's post-verdict orders maintaining juror confidentiality,

---

[22] In commenting on how juror anonymity might have affected the public's perception of the openness and fairness of the trial, we do not reach the direct question whether anonymity was justified. That question is not before us.

32

limiting the release of juror information, and placing restrictions on juror interviews.

The orders of the district court are **AFFIRMED** in Part, **REVERSED** in Part.  Petitions for writ of mandamus are **DENIED**.