Petition for Writ of Mandamus Conditionally Granted and Opinion filed
November 16, 2007








Petition for
Writ of Mandamus Conditionally Granted and Opinion filed November 16, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00804-CV

____________

 

IN RE ASHLEY PAIGE BENTON, Relator

 



 

ORIGINAL PROCEEDING

WRIT OF MANDAMUS

 



 

O P I N I O N

In this original proceeding, relator, Ashley Paige Benton,
seeks a writ of mandamus ordering respondent, the Honorable Devon Anderson, to
vacate the gag order entered against relator, the trial attorneys, and the
attorneys= agents and employees in the underlying criminal
case.  We conditionally grant the writ. 

                        I.  Factual and Procedural Background

On June 6, 2006, members of two gangs known as MS-13 and
Crazy Crew clashed in a Houston Park.  During the ensuing fight, relator, who
was then sixteen, stabbed fifteen-year-old Gabriel Granillo.  Granillo died at
the scene; relator was indicted for murder and certified to be tried as an
adult.  








On June 13, 2007, the State filed a motion for entry of a
gag order.  The State asked the respondent to take judicial notice of A(1) the
unusually emotional nature of the issues involved in this case; (2) the
extensive local media coverage this case has already generated; and (3) the
various and numerous media interviews with the defendant and counsel for the
defendant that have been published and broadcast by local media.@  Respondent did
not grant the motion at that time.  The case went to trial, and on June 29,
2007, respondent declared a mistrial after the jury was unable to reach a
verdict.  

Relator and the State then entered plea bargain
negotiations.  On Thursday, July 12, 2007, the following article about these
negotiations appeared in the Houston Chronicle:

Ashley Benton=s attorneys will try again to
negotiate a plea bargain today for the stabbing death of gang leader Gabriel
Granillo.

Attorney Rick DeToto said prosecutors made an offer Wednesday, which
was rejected.  He said he will make a counteroffer today but doesn=t expect to reach an agreement.  If
negotiations break down, Benton will get a date for a retrial.

AWe could go to trial tomorrow if we had to,@ DeToto said.

Benton, 17, who is charged with murder, was tried last month for
stabbing the 15-year-old boy in the heart during a midafternoon gang fight in
Ervan Chew Park in June 2006.  The week-and-a-half-long trial ended in a
mistrial after the jury deadlocked after almost 18 hours of deliberations.

DeToto refused to say what the offer was, except to say that Benton did
not want to plead guilty to murder.

The
following day, another story elaborating on the proposed plea bargain appeared
in the Houston Chronicle:

Ashley Benton=s lawyers rejected an offer from
prosecutors that called for a murder plea with no prison time in the stabbing
death of a gang member, one of her defense attorneys said Thursday.

Prosecutors presented a second offer Thursday morning, but defense
lawyer Kent Schaffer said he would not discuss details of that deal.

                                                            .
. .








Schaffer said the first offer from prosecutors included 10 years of
deferred adjudication for the 17-year-old, a form of probation where defendants
avoid conviction if they complete the terms.

He said Benton=s camp is hoping
for a lesser charge, such as aggravated assault, and a shorter probationary
term.

At a hearing on Friday, July 13, 2007, relator informed
respondent that she was rejecting the State=s plea bargain. 
At that time, respondent set the case for retrial on January 4, 2008. 
Respondent also informed the parties that she would reconsider the State=s motion for a gag
order and instructed the attorneys not to discuss the particulars of the plea
bargain negotiations.  

On Saturday, July 14, 2007, the Houston Chronicle
again reported on the plea bargain:

Ashley Benton will face a second trial Jan. 4 for last year=s stabbing death of a gang member
after she rejected a second plea agreement offer from prosecutors Friday.

Attorneys would not discuss details of the second offer.

The first offer, rejected in court
Thursday, called for a murder conviction, no prison time and 10 years of
deferred adjudication, one of her defense attorneys confirmed in interviews
later that afternoon. 








More than six weeks later, the trial court held a hearing
on the State=s motion for entry of a gag order.  The State
presented videotapes of television news reports and newspaper articles
concerning Granillo=s death, the charges against relator,
relator=s first trial, and
the plea bargain negotiations.  Relator presented five affidavits from
attorneys who had represented defendants in other highly-publicized criminal
trials.  These included affidavits from (a) Allen Tanner, lead counsel for
Angel Maturino Resendiz, Adubbed the >Railcar Killer= by the local and
national media@;[1]
(b) Stanley Schneider, co-counsel in the capital murder trial of Robert
Angleton;[2]
(c) Wendell Odom, Jr., co-counsel in both capital murder trials of Andrea
Yates;[3]
(d) Chip Lewis, co-counsel for Kenneth Lay in one of the AEnron trials@[4] and co-counsel in
the murder trial of Robert Durst;[5]
and (e) Dan Cogdell, who was involved as counsel in cases commonly
referred to as the ASlave Ranch@ case, the ACadet Murders,@[6] the AHouston City Hall
Bribery Trial,@ and another of the Enron trials.  In essence, each
affiant stated, AIn my opinion, there was as much if not
more, publicity surrounding [the affiant=s case] than there
was in the Ashley Benton case.  In spite of this, we had no problem seating a
jury . . . and there was no gag order entered.@[7]  In his
affidavit, attorney Chip Lewis further attested that when he acted as
co-counsel in the Galveston murder trial of Robert Durst, Awe seated a jury .
. . , even though Galveston County=s jury pool is far
smaller than the jury pool in Harris County, and there was no gag order
entered . . . .@  Respondent
excluded six additional affidavits that originally had been offered by the
Harris County District Attorney=s Office in an unrelated criminal trial as
evidence in opposition to the accused=s request for a change
of venue.  Among the items excluded was the affidavit of Karen Richards,
Program Administrator for Voter Registration, who stated that in 2005, the list
of potential jurors in Harris County included the names of 2,807,640 people.








Respondent granted the State=s request for a
gag order and entered the following Order Restricting Extrajudicial Statements,
which provides, in relevant part:

1.       On August 8, 2006, the State charged the
Defendant with murder.  The State accused the Defendant of stabbing Gabriel
Granillo to death in an ostensible gang fight.  The Defendant=s case generated substantial
publicity from the date of the stabbing.

2.       The Defendant pled not guilty to the State=s allegations, and the case was
tried before a jury.  On June 29, 2007, the Court declared a mistrial and
discharged the jury, because the jury was unable to reach a verdict.

3.       The Defendant=s case, before, during and after trial, generated
extensive media coverage and publicity.  The Court set the Defendant=s case for a second trial in
January 2008, with the hope that publicity surrounding the case would decline
by that time and interfere less with the Defendant=s right to a fair trial and
impartial jury. 

4.       On more than one occasion, the Court has
admonished trial counsel to try the case in court and not in the media.  The
Court made clear its expectations that counsel adhere to the letter and spirit
of Texas Code of Professional Responsibility provisions governing extrajudicial
statements to the media.  The Court=s expectations were not met.

5.       Before, during and after the Defendant=s trial, counsel for the Defendant
exhibited an extraordinary willingness to grant interviews to the media. 
Various media outlets published numerous interviews with trial counsel and many
stories about the Defendant=s case.  

6.       Despite the Court=s admonishments, before, during and
after the Defendant=s trial, counsel for the Defendant
continued to make extrajudicial statements to the media that violated Tex. Disciplinary R. Prof=l Conduct
3.07, reprinted in Tex. Gov=t Code,
tit. 2 subtit[.] G app[.] A (Tex. State
Bar R. art. 10, ' 9).  

7.       For instance, after the Defendant=s trial, counsel for the Defendant
discussed the parties[=] attempts to reach a plea-bargain
agreement with the media in detail.  Counsel=s extrajudicial statements included the explicit terms of
the State=s offer.  

8.       Counsel=s continued, numerous, extrajudicial statements to the
media increase the publicity surrounding the case, thereby potentially
jeopardizing the Court=s ability to seat an impartial jury
in this case.








9.       Counsel=s apparent willingness to continue to make inappropriate
and unethical extrajudicial statements to the media poses an obvious and
specific, serious threat to the judicial process that is likely to interfere
with the Defendant=s fair trial rights and prejudice
potential jurors.

10.     There is a substantial probability that the
Defendant=s fair trial rights will be
prejudiced by publicity that an order restricting extrajudicial commentary by
trial counsel for the Defendant and the State would prevent.  Further less
restrictive alternatives to such an order cannot adequately protect the
Defendant=s fair trial rights.

11.     The Court has a duty to preserve the
Defendant=s fair trial rights and a duty to
ensure as much as possible that pretrial publicity does not impermissibly
influence the jury.  

12.     An order restricting extrajudicial
commentary by trial counsel for the Defendant and the State is necessary to
protect the Defendant=s rights and deal with this
obvious[,] imminent and severe threat to the judicial process.

13.     While the Court is mindful of the great
contributions the media has made to our society and that the First Amendment is
an important right afforded by our Constitution, freedom of expression must,
under these circumstances, yield to the Defendant=s right to a fair trial.

In light of the foregoing, the Court FINDS the following restrictions
are necessary and designed to protect the judicial system=s integrity and the Defendant=s fair trial rights.

Accordingly, in the interest of justice and in light of the relevant
facts and circumstances of this case, the Court ORDERS, ADJUDGES and DECREES
that prior to and during the trial in cause number 1079641, the Defendant, all
attorneys, and all attorney=s staff, employees and/or agents associated with or participating in
this case, shall refrain from making any extrajudicial statements relating to
one or more of the following subjects:

1.       The character, credibility, reputation, or
criminal record of an attorney, a juror, a party, or a witness in the case;

2.       The possibility of a guilty plea and the
substance or details of any plea-bargain negotiations;

3.       The identity of a witness or the expected
testimony of a party or witness;








4.       The contents of any pretrial confessions,
admissions, statement, or examination given or taken by the defendant or the
defendant=s refusal or failure to make any
statement;

5.       Any opinion of the Defendant=s guilt or innocence;

6.       The identity or nature of physical evidence
expected to be presented at trial or the absence of such physical evidence;

7.       The jury=s composition, any juror=s identity, or the contents of any communications from or
to the jury during deliberations;

8.       The strengths or weaknesses of either party=s case;

9.       Any other information an attorney knows or
reasonably should know is likely to be inadmissible as evidence and would
create a substantial risk of prejudice if disclosed.

This Order shall NOT prohibit attorneys from communicating with the
parties or their witnesses in order to prepare for trial.  Nor shall this Order
prohibit the public from attending any sessions before the Court or from
publishing any information they obtain from observing proceedings in this case.

Nothing in this Order shall prohibit any individual from making any
extrajudicial statements without elaboration or characterization
relating to one or more of the following subjects:

1.       The general nature of the case, an
allegation or defense;

2.       Information contained in the public record;

3.       The scheduling or result of any step in
this proceeding; or 

4.       The contents or substance
of any motion or step in the proceeding, to the extent that such motion of
[sic] step in the proceeding is a matter of public record.

 








Relator contends that the trial court=s gag order
violates the free speech guarantees of the Texas Constitution.  She argues that
respondent improperly based the gag order on the quantity of extrajudicial
statements rather than on the content of those statements.  Relator further
asserts that respondent=s findings and the evidence are
insufficient to establish the likelihood of the required level of prejudice to
the integrity of the judicial process or the imminence of any such harm. 
Moreover, relator contends that respondent=s findings reflect
a failure to adequately consider less restrictive alternatives.  Relator also
challenges the exclusion of several affidavits offered as evidence in
opposition to the State=s motion. 

II.  Mandamus Standard of Review

Mandamus is the appropriate method by which to challenge a
gag order.  San Antonio Express-News v. Roman, 861 S.W.2d 265, 266 (Tex.
App.CSan Antonio 1993,
orig. proceeding).  To demonstrate the right to mandamus relief, the relator
must establish that (a) the trial court clearly abused its discretion, and
(b) the relator has no adequate remedy by appeal.  In re Sw. Bell Tel.
Co., L.P., 226 S.W.3d 400, 403 (Tex. 2007); In re Houston Chronicle Publ=g Co., 64 S.W.3d 103,
106 (Tex. App.CHouston [14th Dist.] 2001, orig. proceeding).  The
trial court abuses its discretion if it reaches a decision so arbitrary and
unreasonable as to constitute a clear and prejudicial error of law.  Walker
v. Packer, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding).

III.  Priority of Review

Relator primarily argues that the trial court=s gag order
infringes on the State constitutional rights of those affected; however, she
relies heavily on federal law.  It is therefore helpful to discuss the
protections provided under the federal as well as the state constitutions. 
Because an understanding of federal rights is helpful to understanding state
rights, and because federal constitutional law affords at least as much protection
to the right of free speech as the Texas Constitution, we place the state free
speech guarantee in context by first considering the analogous federal right.[8]








IV.  Federal Constitutional Requirements for
Prior Restraint of Speech

When considering whether to issue a gag order affecting
attorneys and parties, federal courts consider three factors.  AFirst, the court
must consider whether the requested order is narrowly tailored.@  United States
v. Carmichael, 326 F. Supp. 2d 1267, 1293 (M.D. Ala. 2004) (collecting
cases).  Next, the court determines whether a gag order is the least
restrictive means, or if less burdensome alternatives would achieve the same governmental
objective.  Id.  Finally, the court applies the Athreshold standard
for imposing a prior restraint.@  Id.

But courts do not agree on the appropriate threshold
standard.  As summarized in Carmichael:

A three-way circuit split exists
with respect to the third, and most important, factor to be considered: the
threshold standard for imposing a prior restraint.  The United States Courts of
Appeals for the Sixth, Seventh, and Ninth Circuits have held that, before the
court may issue an order restricting the speech of trial participants, it must
find that the speech at issue presents a Aclear and present danger@ or a Aserious and imminent threat@ to a fair trial.  The Courts of Appeals for the Third and
Fifth Circuits have adopted the Asubstantial likelihood of material prejudice@ standard.  The Fourth and Tenth
Circuits have held that the appropriate standard is Areasonable likelihood@ of prejudice.

 

Id. (citations
omitted).  And interestingly, the dispute between relator and the State
concerning the state constitutional threshold for prior restraint of speech
mirrors the split among the circuit courts concerning the federal constitutional
threshold.








V. 
Proposed Standards for Reviewing Gag Orders 

Under the Texas Constitution

A.      Davenport v. Garcia

Relator urges us to review the order for a violation of
state constitutional law by applying the standard set forth by the Texas
Supreme Court in Davenport v. Garcia.  834 S.W.2d 4, 10 (Tex. 1992)
(orig. proceeding).  In Davenport, the Texas Supreme Court concluded
that the Texas Constitution provides greater protection of speech than the
United States Constitution and held that prior restraints on speech in a civil
case are presumptively unconstitutional under Article I, Section 8 of the Texas
Constitution.  Id. at 7B9; compare U.S. Const. amend. I (ACongress shall
make no law  . . abridging the freedom of speech, or of the
press.@) with Tex. Const. art. I, ' 8 (AEvery person shall
be at liberty to speak, write or publish his opinions on any subject, being
responsible for the abuse of that privilege; and no law shall ever be passed
curtailing the liberty of speech or of the press.@).  The Davenport
court concluded that a gag order in a civil proceeding will withstand state
constitutional scrutiny only if there are specific findings supported by
evidence that: 

(1)     an imminent and irreparable harm to the
judicial process will deprive litigants of a just resolution of their dispute,
and 

(2)     the judicial action represents the least
restrictive means to prevent that harm.  

Davenport, 834 S.W.2d at
10.








Although Davenport involved a gag order in a civil
case, it has been applied to similar orders in criminal cases.  See In re
Graves, 217 S.W.3d 744, 753 (Tex. App.CWaco 2007, orig.
proceeding) (holding, under Davenport, that the trial court abused its
discretion by issuing a gag order without sufficiently specific findings to
support the order under the Texas Constitution); San Antonio Express-News,
861 S.W.2d at 268 (holding the Davenport test applicable in determining
the validity of a prior restraint of speech in a criminal proceeding).  The
Fourth Court of Appeals further concluded that the application of Davenport
to criminal proceedings is an appropriate means of protecting the public=s right of access
to criminal trials and proceedings and free speech through the dissemination of
public information.  San Antonio Express-News, 861 S.W.2d at 268.  

B.      United
States v. Brown

The State, on the other hand, argues that Davenport
should be limited to civil cases because, in reaching its conclusions, the Davenport
Court gave no consideration to the constitutional right of a defendant to a
fair and impartial jury.  See U.S.
Const. amend. VI (AIn all criminal prosecutions, the accused
shall enjoy the right to a speedy and public trial, by an impartial jury . . .
.@).  The State
further contends that Aunfettered public discourse@ by trial
participants subject solely to the Aimminent and
irreparable harm@ standard means the jury must be tainted
before a gag order may issue.  Relying primarily on the Fifth Circuit Court of
Appeals= opinion in United
States v. Brown,[9]
the State urges us to conclude that prior restraints on the speech of
participants in a criminal trial are available if there is a  substantial
likelihood that the extrajudicial comments will undermine a fair trial.  In
other words, the State urges us to apply the standard followed by the Fifth
Circuit in reviewing alleged infringement of federal constitutional rights.[10] 
The State further argues that this standard has been satisfied in this case.








Although the United States Supreme Court has found that the
Asubstantial
likelihood of material prejudice@ test protected an
attorney=s First Amendment
rights under some circumstances, such language is subject to wide variance in
interpretation.  Gentile v. State Bar of Nev., 501 U.S. 1030, 1076, 111
S. Ct. 2720, 2745 (1991) (plurality op.).[11] 
Thus, writing separately in Gentile, Justice Kennedy stated, AInterpreted in a
proper and narrow way . . . the phrase [>]substantial
likelihood of material prejudice[=] might punish
only speech that creates a danger of imminent and substantial harm.@  Id. at
1036, 111 S. Ct. at 2725 (Kennedy, J., joined by Marshall, Blackmun, and
Stevens, J.J.).  And although there are significant differences between the
instant case and Gentile, the latter is instructive on the necessity and
scope of permissible speech, even under the lower standard recommended here by
the State.

C.      Gentile
v. State Bar of Nevada








In Gentile, a lawyer held a press conference just
hours after his client had been indicted on criminal charges, asserting that
the State sought the indictment and conviction of an innocent person as a
scapegoat and had not Abeen honest enough to indict the people
who did it; the police department, crooked cops.@  Id. at
1033B34, 111 S. Ct. at
2723B24.  He referred
to the Aso-called other
victims@ as Aknown drug dealers
and convicted money launderers@ and named a police detective as the
perpetrator of the crimes with which Gentile=s client was
charged.  Id. at 1063, 111 S. Ct. at 2739.  After his client was tried
and acquitted on all counts, the State Bar reprimanded Gentile for violating
Nevada Supreme Court Rule 177(1), which prohibits the dissemination of
information that  a lawyer knows or reasonably should know will have A>a substantial
likelihood of prejudicing an adjudicative proceeding.=@  Id.
(quoting Nevada SCR 177 (1)).[12] 
Thus, the standard analyzed by the CourtCa substantial
likelihood of material prejudiceCnecessarily was
derived from the Rule that Gentile allegedly violated.

In reviewing the attorney=s challenge to
this Rule, the Court noted that Athe criminal
justice system exists in a larger context of a government ultimately of the
people, who wish to be informed about happenings in the criminal justice
system, and, if sufficiently informed about those happenings, might wish to
make changes in the system.@  Id. at 1070, 111 S. Ct. 2742. 
Justice Kennedy  elaborated on the important role played by the media in
providing coverage of criminal proceedings:

The judicial system, and in particular our criminal justice courts,
play a vital part in a democratic state, and the public has a legitimate
interest in their operations.[13] 
A[I]t would be difficult to single
out any aspect of government of higher concern and importance to the people
than the manner in which criminal trials are conducted.@[14]  Public vigilance serves us well,
for A[t]he knowledge that every criminal
trial is subject to contemporaneous review in the forum of public opinion is an
effective restraint on possible abuse of judicial
power . . . . Without publicity, all other checks are
insufficient: in comparison of publicity, all other checks are of small
account.@[15]  As we said in Bridges v.
California,[16]
limits upon public comment about pending cases are Alikely to fall not only at a
crucial time but upon the most important topics of
discussion . . . .[@][17]

ANo suggestion can be found in the Constitution that the freedom there
guaranteed for speech and the press bears an inverse ratio to the timeliness
and importance of the ideas seeking expression.@[18] 








In Sheppard v. Maxwell,[19]
we reminded that A[t]he press . . . guards against the miscarriage of justice
by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and
criticism.@

Id. at 1035, 111 S.
Ct. 2720, 2724B25 (citations moved to footnotes).  Reading the Nevada
rule narrowly, the Court concluded that the speech for which Gentile was
sanctioned did not present a substantial likelihood of material prejudice.  

D.      Gentile
Represents the State AConstitutional
Minimum@

Gentile, of course, addresses speech protected by the First
Amendment of the United States Constitution, and does not directly address
speech protected by state constitutions.  Under Texas law, however, the Gentile
standard is treated as the Aconstitutional minimum.@  Benton,
980 S.W.2d at 431.  As in Gentile, Texas courts apply this minimum
standard when reviewing sanctions of an attorney=s speech that
violated an applicable state rule of professional conduct.  Id. at 434. 
Thus, this standard applies to speech that has already occurred.  

But Texas courts have consistently applied a higher
standard when reviewing prior restraints of speech.  Id. (AThe cases in which
this Court has held the Texas Constitution to create a higher standard than the
First Amendment have involved prior restraints in the form of court orders
prohibiting or restricting speech.@); Ex parte
Tucci, 859 S.W.2d 1, 19-26 (Tex. 1993); Davenport, 834 S.W.2d at 10;
Graves, 217 S.W.3d at 753; San Antonio Express-News, 861 S.W.2d
at 268.  








Here, however, we need not determine whether the higher Davenport
standard applies in this criminal case, because the record and the findings
do not support the imposition of a gag order even under the lower standards
articulated in Gentile and Brown.  Specifically, the findings and
the evidence do not establish, as a Aconstitutional
minimum,@ that the order was
narrowly-tailored[20]
to avert a substantial likelihood of material prejudice.[21] 


VI.  Substantial Likelihood of Material
Prejudice 

A.      Right to a
Fair Trial

Although both the State and a criminal defendant have the
right to a fair trial, respondent primarily focused on relator=s right to a fair
trial and an impartial jury.  In fact, the order refers eight times to relator=s right to a fair
trial.  And although the text of the Sixth Amendment addresses only the rights
of the accused, in Texas A[i]t is the duty of the trial court, the
attorney representing the accused, the attorney representing the state and all
peace officers to so conduct themselves as to insure a fair trial for both
the state and the defendant, not impair the presumption of innocence, and
at the same time afford the public the benefits of a free press.@  Tex. Code Crim. Proc. Ann. art. 2.03(b)
(Vernon 2005) (emphasis added).  We therefore review the findings and the
record for evidence that future extrajudicial statements by relator, counsel,
or the employees or agents of counsel involved in the case are substantially
likely to cause material prejudice to the judicial proceedings. 

 

 








B.      No
Supported Finding of Prejudice

We first note that there is only one finding potentially
identifying a matter that, discussed with the press, may have caused or could
cause prejudice.  Instead, it appears from the wording of the order that
respondent presumed that publicity is inherently prejudicial to a criminal
defendant.  In language such as the following, respondent emphasized the
quantity of publicity over its content or even its effects:

The Defendant=s case generated substantial
publicity from the date of the stabbing.

. . .

The Defendant=s case, before, during and after
trial, generated extensive media coverage and publicity.

. . .

Before, during and after the Defendant=s trial, counsel for the Defendant exhibited an
extraordinary willingness to grant interviews to the media.  Various media
outlets published numerous interviews with trial counsel and many stories about
the Defendant=s case. 

. . .

Counsel=s continued,
numerous, extrajudicial statements to the media increase the publicity
surrounding the case, thereby potentially jeopardizing the Court=s ability to seat
an impartial jury in the case.

(emphasis
added).  But there has been no showing that such publicity is materially
prejudicial.  Even pervasive and concentrated publicity is not prejudicial per
se.  Neb. Press Ass=n v. Stuart, 427 U.S. 539,
565, 96 S. Ct. 2791, 2805 (1976).  








There is no requirement that qualified jurors be totally
ignorant of the facts and issues involved in a case.  Murphy v. Florida,
421 U.S. 794, 799B800, 95 S. Ct. 2031, 2036 (1975); Irvin
v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642B43 (1961); see
also Etheridge v. State, 903 S.W.2d 1, 6 (Tex. Crim. App. 1994) (AExtensive
knowledge in the community of either the crime or the defendant, without more,
is insufficient to render a trial unconstitutional.@) (citing Faulder
v. State, 745 S.W.2d 327, 339 (Tex. Crim. App. 1987) (en banc)).  Rather,
publicity about the case must be so pervasive, prejudicial, and inflammatory
that there is a substantial likelihood that prospective jurors= initial opinions
cannot be set aside.  See Etheridge, 903 S.W.2d at 6. 

The previous disclosure of the details of a plea bargain
negotiation has not been shown to be materially prejudicial to these
proceedings.  Respondent apparently concluded that counsel for relator passed
this information to the press, and thereby violated Texas Disciplinary Rule of
Professional Conduct 3.07.  This Rule prohibits a lawyer from making Aan extrajudicial
statement that a reasonable person would expect to be disseminated by means of
public communication if the lawyer knows or reasonably should know that it will
have a substantial likelihood of materially prejudicing an adjudicatory
proceeding.@  Tex.
Disciplinary R. Prof=l Conduct 3.07.  Thus, a violation occurs only if the lawyer
(1) would have expected the information to be disseminated,[22]
and (2) knew or reasonably should have known that the statement would pose a
substantial likelihood of material prejudice.  Here, there is no evidence
supporting the second prong of the test.  Regardless of how the information
came to the attention of the press, the record does not support a finding that
a single disclosure of plea bargain information or even publicity in general
presented a substantial likelihood of material prejudice.[23]









Even if one assumes that disclosure of the details of plea
bargain negotiations would be prejudicial when the disclosure occurs
immediately before trial, these reports appeared approximately six months before
relator=s second trial,
which was scheduled for January 2008.  Considering the specific statements at
issue, we see no substantial likelihood of material prejudice when such a
significant period of time elapses between the statements and the seating of a
jury.  See, e.g., Patton v. Yount, 467 U.S. 1025, 1035, 104 S.
Ct. 2885, 2891, 81 L. Ed. 2d 847 (1984) (A[I]t is clear that
the passage of time between a first and a second trial can be a highly relevant
fact.@); Levine v.
U.S. Dist. Ct. for the Cent. Dist. of Cal., 764 F.2d 590, 598 (9th Cir.
1985) (noting that publicity immediately prior to trial Ahas a greater
potential for prejudice than publicity months in advance of trial@); Chase v.
Robson, 435 F.2d 1059, 1061 (7th Cir. 1970) (holding that newspaper
articles that were seven months old at the time of the gag order and the trial
were insufficient to support Athe proposition that the defendants= future first
amendment utterances, if any, would interfere with the fair administration of
the trial@).  Respondent=s order cites no
other alleged violation of Rule 3.07 or any other improper extrajudicial
statements, but, instead, offers only this one specific occurrence as an
example.  The record does not demonstrate that defense counsel made additional
disclosures or would make similar disclosures in the future.  To the contrary,
the Houston Chronicle reported that relator=s counsel refused
to discuss the details of a second plea bargain negotiation.  








The State contends the July 2007 disclosure is but one
instance of defense counsel=s improper extrajudicial statements and
refers us to two other statements that appeared in the Houston Chronicle. 
The first statement appeared in an article dated July 8, 2006.  There, DeToto
is quoted as stating, AMr. Granillo [complainant] swung a bat at
her, not once, but twice . . . That=s when [relator]
reacted.  The idea that those young men were just strolling through the park
picking flowers is bull[----].@  The second article, dated July 14, 2006,
contains the statement that DeToto Asaid Wednesday
that he briefly saw a Houston police offense report in which Villatoro
acknowledged he and the Granillo brothers were members of the violent MS-13
gang.@  

But these statements do not support the trial court=s order.  Defense
counsel made these statements to the press nearly a year before relator=s first trial, and
more than a year before the trial court=s order.[24] 
Moreover, evidence about the gang membership of the decedent and various
witnesses and the details of relator=s and the decedent=s respective roles
in the fight were the subject of testimony during the first trial; thus, this
material is now a matter of public record.  No incremental increase in
prejudice from future statements has been shown.

With the exception of the disclosure of one plea bargain
negotiation purportedly made by defense counsel, our review of the news
articles and broadcasts reveals nothing more than defense counsels= assertions of
relator=s innocence based
on self-defense, reports of trial proceedings, and reasonable inferences from
witness testimony.  A number of newspaper articles are merely reports of the
trial proceedings and contain no extrajudicial comments attributed to counsel. 
In sum, the material does not present a substantial likelihood of material
prejudice:

To hold that the mere existence of
any preconceived notion as to the guilt or innocence of an accused, without
more, is sufficient to rebut the presumption of a prospective juror=s impartiality
would be to establish an impossible standard.  It is sufficient if the juror
can lay aside his impression or opinion and render a verdict based on the
evidence presented in court. 








Irvin, 366 U.S. at 722B23, 81 S. Ct. at
1642B43.

Finally, despite respondent=s exclusion of
evidence of the number of potential jurors in Harris County, we are not unaware
that Harris County, with its millions of residents, is the most populous county
in Texas and one of the most populous counties in the entire nation.  We cannot
say that the content of the publicity thus far, including the disclosure of
details of a single plea bargain negotiation, could result in such prejudice
that the trial court=s ability to seat twelve impartial jurors
would be jeopardized in the absence of a gag order.  Cf. Neb. Press Ass=n, 427 U.S. at 563
n.7, 96 S. Ct. at 2805 n.7 (A[T]he combined population of Lincoln
County and the adjacent counties is over 80,000 providing a substantial pool of
prospective jurors.@); Columbia Broad. Sys., Inc. v. U.S.
Dist. Ct. for the Cent. Dist. of Cal., 729 F.2d 1174, 1181 (9th Cir. 1984)
(A[I]n a populous
metropolitan area, the pool of potential jurors is so large that even in cases
attracting extensive and inflammatory publicity, it is usually possible to find
an adequate number of untainted jurors.@).  








We recognize there may be cases in which the record shows
that material prejudice from extrajudicial statements is so likely that the
trial court could act within its discretion in imposing prior restraint on the
speech of trial participants.  See Sheppard v. Maxwell, 384 U.S. 333,
363, 86 S. Ct. 1507, 1522 (1966) (stating trial courts should take steps to
protect  processes from prejudicial outside influences, and prosecutors,
defense counsel, the defendant, witnesses, court staff, and law enforcement
should not be permitted to frustrate that function).  However, it is only the
occasional case that presents a danger of prejudice from pretrial publicity.  Gentile,
501 U.S. at 1054 (Kennedy, J., concurring); see also In re Houston
Chronicle Publ=g Co., 64 S.W.3d at 105
(refusing non-party newspaper=s request to set aside gag order directed
to trial participants in the intensely publicized Yates murder trial).[25] 
Thus far, this is not such a case.  We therefore hold that respondent abused
her discretion in entering the gag order under review.  

VII.  Conclusion

Because no appealable
order has been entered, we conclude relator has no adequate remedy by appeal.  See
San Antonio Express-News, 861 S.W.2d at 267 (finding the relator had no
adequate legal remedy because no appealable order had been entered, and relators
could only test the gag order by violating it and subjecting themselves to
contempt proceedings).[26] 
Accordingly, we conditionally grant the petition for a writ of mandamus
directing the trial court to vacate its gag order.  The writ will issue only if
the trial court fails to act in accordance with this opinion.

 

 

/s/      Eva M. Guzman

Justice

 

Petition Conditionally Granted and
Opinion filed November 16, 2007.

Panel consists of Justices Fowler,
Guzman, and Hudson.*










[1]  The facts of this case and evidence of extraneous
offenses are discussed in Resendiz v. State.  112 S.W.3d 541 (Tex. Crim.
App. 2003) (en banc).





[2]  See Angleton v. State, 971 S.W.2d 65 (Tex.
Crim. App. 1998) (en banc).





[3]  See Yates v. State, 171 S.W.3d 215 (Tex. App.CHouston [1st Dist.] 2005, pet. ref=d.); Ex parte Yates, 193 S.W.3d 149 (Tex. App.CHouston [1st Dist.] 2006, no pet.) (mem. op.).





[4]  A brief summary of events connected with Lay are
addressed in In re Arthur Andersen, L.L.P.  121 S.W.3d 471 (Tex. App.CHouston [14th Dist.] 2003, orig. proceeding).





[5]  See In re Durst, 148 S.W.3d 496 (Tex. App.CHouston [14th Dist.] 2004, no pet.) (maj. op. on reh=g).





[6]  See Graham v. State, 3 S.W.3d 272 (Tex. App.CFort Worth 1999, pet. ref=d); Zamora v. State, 998 S.W.2d 290 (Tex. App.CFort Worth 1999, pet. ref=d)





[7]  This language is taken from the affidavit of Allen
Tanner; similar language is found in the remaining affidavits.





[8]  We note that when deciding issues raised under both
federal and state constitutional law, the Texas Supreme Court has followed
varying approaches in determining which body of law to address first.  In Davenport
v. Garcia, the Court stated that A[b]asing
decisions on the state constitution whenever possible avoids unnecessary
federal review.  This not only lessens federal interference into state issues,
but also results in >efficient judicial management.=@  834 S.W.2d 4, 17 (Tex. 1992) (quoting Stewart G.
Pollock, Adequate and Independent State Grounds as a Means of Balancing the
Relationship Between State and Federal Courts, 63 Tex. L. Rev. 977, 984 (1985)).  The Court continued, AThe soundest way to avoid such unnecessary review and
delay for litigants is to rely on the state constitution in the first instance.@  Id. at 18.  Subsequently, however, the Court
has examined federal constitutional law first if the United States Supreme
Court Ahas recently addressed the application of the First
Amendment@ in a similar context.  Comm=n for Lawyer Discipline v. Benton, 980 S.W.2d 425, 429B30 (Tex. 1998); Operation Rescue-Nat=l v. Planned Parenthood of Houston & Se. Tex.,
Inc., 975 S.W.2d 546, 556 (Tex. 1998)
(analyzing abortion protesters= First
Amendment claim before Texas constitutional claim because the United States
Supreme Court had recently written an opinion regarding the application of the federal
constitution in an abortion protest context).  Most recently, the Court has
held, ANo rigid order of analysis is necessary, despite
occasional language to the contrary in some of our opinions.@  Bentley v. Bunton, 94 S.W.3d 561, 579 (Tex.
2002). 





[9]  218 F.3d 415 (5th Cir. 2000).





[10]  The State alternatively advocates a Areasonable likelihood@ standard, which some courts have applied to free speech claims under
the First Amendment.  See, e.g., In re Dow Jones & Co., 842 F.2d
603, 606 (2d Cir. 1988); In re Russell, 726 F.2d 1007, 1010 (4th Cir.
1984); United States v. Tijerina, 412 F.2d 661, 666 (10th Cir. 1969); S.
Bend Tribune v. Elkhart Cir. Court, 691 N.E.2d 200, 202 (Ind. App. 1998); Sioux
Falls Argus Leader v. Miller, 610 N.W.2d 76, 86 (S.D. 2000).  But the Texas
Court of Criminal Appeals has acknowledged that both it and the Texas Supreme
Court have interpreted the Texas Constitution as providing greater protection
in some instances thant does the federal constitution.  Ex parte Mitchell,
977 S.W.2d 575, 580 (Tex. Crim. App. 1997); see also Heitman v. State,
815 S.W.2d 681, 690 (Tex. Crim. App. 1991) (quoting LeCroy v. Hanlon,
713 S.W.2d 335, 338 (Tex. 1986)) (A>The
federal constitution sets the floor for individual rights; state constitutions
establish the ceiling.=@).  And the Asubstantial
likelihood@ standard connotes a stronger showing than the Areasonable likelihood@ standard.  Brown, 218 F.3d at 427.  Because, as discussed infra,
the Asubstantial likelihood@ standard is the Aconstitutional minimum,@ the lower Areasonable likelihood@ does not apply.





[11]  This is a lower standard than that which applies to
the media.  Gentile, 501 U.S. at 1070B71,
111 S. Ct. at 2742B43.  





[12]  This rule is analogous to Texas Disciplinary Rule of
Professional Conduct 3.07(a).





[13]  Citing Landmark Commc=ns, Inc. v. Virginia, 435 U.S. 829, 838B39, 98 S. Ct.
1535, 1541B42 (1978). 





[14]  Quoting Richmond Newspapers, Inc. v. Virginia,
448 U.S. 555, 575, 100 S. Ct. 2814, 2826(1980). 





[15]  Quoting In re Oliver, 333 U.S. 257, 270B71, 68 S. Ct. 499, 506B07 (1948).





[16]  314 U.S. 252, 62 S. Ct. 190, (1941).





[17]  Citing Bridges, 314 U.S. at 268B69, 62 S. Ct. at 196B97.





[18]  Id.





[19]  384 U.S. 333, 350, 86 S. Ct. 1507, 1515 (1966).





[20]          The restraint on speech is narrowly tailored
to achieve [governmental] objectives. The regulation of attorneys= speech is limitedCit
applies only to speech that is substantially likely to have a materially
prejudicial effect; it is neutral as to points of view, applying equally to all
attorneys participating in a pending case; and it merely postpones the
attorneys= comments until after the trial. 

Gentile, 501
U.S. at 1076, 111 S. Ct. at 2745.  Because relator does not specifically
challenge the order as overly broad, we do not address this requirement
further.





[21]  Id.  Relator also argues that the gag order
is not the least restrictive means to fulfill the government=s objective.  Because we conclude that the findings
and evidence are insufficient to demonstrate a substantial likelihood of
material prejudice, we need not address the argument that such prejudice could
be averted by less restrictive means. 





[22]  We note that rRelator=s counsel represented to the trial court that a defense attorney did
not relay this information to the media, but instead, the information was
obtained by or from a person who overheard a privileged conversation between an
attorney and an investigator in a courthouse hallway.  We further note that the
trial court answered this statement by saying, AI will take you at your word as an officer of this court, Mr. DeToto.@  The State did not controvert this matter.





[23]  Arguably, a greater threat to relator=s right to a fair trial may arise from the gag order
because, of all the witnesses to the fight and to Granillo=s death, only relator is barred from speaking to the
press.  The order additionally expressly bars counsel for relator from publicly
denying her culpability, despite the fact that relator=s plea of Anot
guilty@ is a matter of public record.  See id., cmt. 3
(A[A]n otherwise objectionable statement may be
excusable if reasonably calculated to counter the unfair prejudicial effect of
another public statement.@). 





[24]  If any prejudice resulted from these statements, one
could expect that such prejudice would have made it difficult to empanel an
impartial jury in the first trial.  See Yount, 467 U.S. at 1032, 104 S.
Ct. at 2889 (AIn this case, the extensive adverse publicity and the
community=s sense of outrage were at their height prior to Yount=s first trial . . . .@).  Here, however, the State does not dispute that of 120 venire
members, only a handful of jurors were removed for cause.  Cf. id.
at 1029, 104 S. Ct. at 2888 (A[Seventy-seven
percent of venire members] admitted they would carry an opinion into the jury
box.@); Irvin, 366 U.S. at 727, 81 S. Ct. at 1645
(268 members of a panel of 430 potential jurors excused for cause).  Moreover, the State does not contend
(and the trial court did not find) that any excused venire person was
prejudiced by extrajudicial statements by trial participants rather than by
media reports of public information or of material independently obtained by
journalists from other sources.  





[25]  In In re Houston Chronicle, the prior
restraint on speech was not the subject of a constitutional challenge from any
individual who was the subject of the order.





[26]  Relator also contends that respondent abused her
discretion in excluding six affidavits which relator offered into evidence at
the hearing on the gag order.  The six affidavits are the affidavits the Harris
County District Attorney=s Office introduced in support of its opposition to
the defendant=s request for a change of venue in the case of State
v. Slade, Cause Nos. 1121606 & 1121607 (338th Dist. Ct., Harris County,
Tex. July 16, 2007; July 17, 2007; July 31, 2007; July 26, 2007; & Aug. 2,
2007).  Respondent sustained the State=s
objection that the affidavits were not relevant because they were submitted in
an unrelated case on the issue of venue.  We conclude the affidavits were, in
fact, relevant because they are material to a fact in issue, i.e., that fair
and impartial juries have been seated in highly publicized cases in Harris
County, and they make that fact more probable than it would be without the
affidavits.  See Miller v. State, 36 S.W.3d 503, 507 (Tex. Crim. App.
2001).  Therefore, we also conclude respondent abused her discretion in
excluding these affidavits from evidence. 





* 
Senior Justice J. Harvey Hudson sitting by assignment.